CATERPILLAR, INC v DEPARTMENT OF TREASURY

Docket No. 90999. Argued December 5, 1991 (Calendar No. 11). Decided July 31, 1992. Certiorari denied by the Supreme Court of the United States on November 30, 1992, 506 US — (1992).

Caterpillar, Inc., a Delaware corporation with its principal place of business in Peoria, Illinois, that conducts a portion of its business in Michigan, brought an action in the Court of Claims against the Department of Treasury, Revenue Division, seeking a refund of all single business taxes paid between 1981 and 1984, claiming that the capital acquisition deduction permitted under the Single Business Tax Act burdens interstate commerce, thereby violating the Commerce Clause of the United States Constitution by discriminating against non-Michigan-based companies. The court, Thomas L. Brown, J., held that the capital acquisition deduction was unconstitutional and disallowed its application to any taxpayer beginning September 30, 1989. The Court of Appeals, SULLIVAN, P.J., and WAHLS and JANSEN, JJ., in an opinion per curiam, affirmed the decision to grant prospective relief only without ruling on the issue whether the capital acquisition deduction violates the Commerce Clause, and held that only the language of the deduction provision that produces a discriminatory effect should be removed (Docket No. 119584). Both parties appeal.

In an opinion by Justice RILEY, joined by Justices BOYLE, GRIFFIN, and MALLETT, the Supreme Court held:

MCL 208.23(a), (c); MSA 7.558(23)(a), (c), the capital acquisition deduction of the Single Business Tax Act, does not violate the Commerce Clause of the United States Constitution.

1. Under the Single Business Tax Act, the tax base of a taxpayer doing business both in and outside Michigan is apportioned by multiplying the tax base by the average of the ratios of its Michigan payroll to its total payroll, its Michigan property to its total property, and its Michigan sales to its total sales. The capital acquisition deduction exempts the acquisition

REFERENCES

Am Jur 2d, State and Local Taxation §§ 96-99.
See the Index to Annotations under Business and Commerce; Constitutional Law; Taxes.

of capital assets from a taxpayer's tax base after apportionment for purposes of calculating the single business tax. Because the apportioned base represents only Michigan business activity, only tangible personal property and real estate related to Michigan business activity qualify for the deduction. Personal property is apportioned pursuant to subsection 23(a), real property, pursuant to subsection 23(c). A two-factor formula is used to calculate the apportionment of tangible personal property by multiplying the total cost of tangible personal property acquired during the tax year, regardless of where purchased, by a factor derived from an average of the ratio of the taxpayer's Michigan property to its total property and the ratio of its Michigan payroll to its total payroll. The deduction for real property is one hundred percent of the cost of real property located in Michigan.

2. Under *Complete Auto Transit, Inc v Brady,* 430 US 274 (1977), a state tax will withstand scrutiny under a Commerce Clause challenge if it is applied to an activity having a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. In this case, the requisite nexus exists because Caterpillar conducts a portion of its business in Michigan and there is a definite link between Michigan and Caterpillar's business activities that the state seeks to tax. The methods of apportionment are fair in that they are internally and externally consistent. No facts were presented indicating any substantial misappropriation or any distorted results. In being available to any taxpayer, the deduction is not discriminatory on its face. Use of different apportionment formulas in determining the single business tax base and the capital acquisition deduction does not evidence any discriminatory purpose, nor was any discriminatory effect on interstate commerce shown. Finally, in light of Caterpillar's business activity in Michigan, Caterpillar received benefits fairly related to services provided by the state.

Reversed.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the apportionment formulas applied both to the personal property and the real property components of the capital acquisition deduction of the single business tax, on their face and in their inevitable effect, discriminate against interstate commerce. The CAD apportionment scheme is a subtle, but classic example of interstate economic protectionism forbidden by the Commerce Clause.

The Commerce Clause prohibits states from discriminating

between economic entities on the basis of in- or out-of-state status and between economic goods, services, or activities on the basis of in- or out-of-state origin or location. A state may tax to promote its domestic economy and compete with other states for a share of interstate commerce, but only in ways uniformly affecting a given type of economic activity, without any discriminatory treatment of out-of-state entities or activities. A state tax violates the Commerce Clause if, as a result of credits or deductions, the effective tax rate imposed on the income or other tax base apportioned to a state varies on the basis of the out-of-state status of the taxpayer or related business entity, or on the basis of the degree of activity in interstate commerce, so as to favor in-state commerce.

Under the personal property CAD, the taxpayer generally may deduct from its Michigan-apportioned tax base the costs of tangible personal property accrued during the tax year without regard to whether it is acquired or placed into service in state or out of state. Because the property factor is based on all real and personal property owned or rented during the tax year, it necessarily will be affected, and the apportionment formula resulting from the average of the property and payroll factors also will be affected by whether newly acquired personal property subject to the CAD is placed into service in or out of state. Because the apportionment of the personal property CAD is tied directly to the average proportion of property and payroll situated in Michigan, a Michigan-based company will reap a greater benefit from any investment in personal property than will a predominantly non-Michigan-based company. Further, an in-state investment in personal property will always increase the property factor and the CAD formula, and an out-of-state investment will always decrease both. Thus, a company investing in state will always reap a greater personal property CAD.

Under the real property CAD, the taxpayer generally may deduct from its Michigan-apportioned tax base the costs of real property physically located in Michigan that accrued during the tax year. Thus, the apportionment of the real property CAD to Michigan is strictly dependent on the location of the property and does not depend on the relative status of the taxpayer.

Both the personal property and the real property CAD apportionment formulas, when applied in conjunction with the underlying three-factor apportionment of the SBT itself, result in the imposition of higher effective tax rates with regard to companies that are either predominantly non-Michigan based or that direct their investments outside Michigan. The discriminatory effects converge so as to afford an especially preferential

tax rate to a Michigan-based company that invests in Michigan in contravention of the Commerce Clause. By relying in part on Michigan sales for initial taxation purposes, while relying exclusively on Michigan property and payroll for relevant deduction purposes, the combined scheme of the SBT and the CAD results in classic economic protectionism and is invalid per se.

Justice BRICKLEY, dissenting, stated that the capital acquisition deduction for personal property, that is dependent on the relation of the amount of a company's property and payroll in Michigan and the amount out of state, is provided on an impermissible basis, and thus is violative of the Commerce Clause of the United States Constitution. The capital acquisition deduction for real property, however, is provided wholly independent of a company's interstate character, and thus does not violate the Commerce Clause.

188 Mich App 621; 470 NW2d 80 (1991) reversed.

CONSTITUTIONAL LAW — COMMERCE CLAUSE — SINGLE BUSINESS TAX — CAPITAL ACQUISITION DEDUCTION.

The capital acquisition deduction of the Single Business Tax Act does not violate the Commerce Clause of the United States Constitution (US Const, art I, § 8, cl 3; MCL 208.23[a], [c]; MSA 7.558[23][a], [c]).

*McDermott, Will & Emery* (by *Richard A. Hanson, John S. Pennell, Don S. Harnack, Gregory G. Palmer,* and *Carol S. Portman*) and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Peter S. Sheldon* and *Jeffery V. Stuckey*) for the plaintiff.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Russell E. Prins* and *Terry P. Gomoll,* Assistant Attorneys General, for the defendant.

Amici Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Alan M. Valade, Benjamin O. Schwendener, Jr., James H. Novis,* and *Roger Cook*) for Automatic Data Processing, Inc., ADP Automotive Claims Services, Inc., ADP Credit Corp., ADP Financial Informa-

tion Services, Inc., Atlantic Richfield Company, ARCO Chemical, Inc., Consumers Power Company, Dart Container Corporation, Dart Container Corporation of Michigan, Handleman Company, Kojaian Properties, Inc., Lane Bryant, Inc., Lerner Stores, Inc., Limited Express, Inc., Limited Stores, Inc., Pulte Homes Corporation, Schostak Brothers & Company, Inc., Sizes Unlimited, Inc., and Victoria's Secret Stores, Inc.

*Sutherland, Asbill & Brennan* (by *Jerome B. Libin* and *Kathleen A. Foudy*) and *Raymond & Dillon, P.C.* (by *Thomas J. Kenny*) for Michigan Manufacturers Association, Michigan Chamber of Commerce, and Greater Detroit Chamber of Commerce.

RILEY, J. Because the issue here presented can be best understood in its factual context, we begin with a statement of the essential facts from which the issue arises.

## I. FACTS AND PROCEEDINGS

Caterpillar, Inc., is a Delaware-based corporation qualified under the laws of Michigan, with its principal place of business in Peoria, Illinois. It is a multinational company, which designs, manufactures, and markets earth-moving, construction, and materials-handling machinery and equipment, as well as engines for such products. Caterpillar conducts a portion of its business in Michigan, and pays taxes to the State of Michigan pursuant to the Single Business Tax Act (SBT), MCL 208.1 *et seq.*; MSA 7.558(1) *et seq.*

Caterpillar brought an action in the Court of Claims against the Department of Treasury, seeking a refund of all SBT taxes it paid in the years

1981 through 1984.[1] It challenges the constitution-
ality of the capital acquisition deduction (CAD),
MCL 208.23(a), (c); MSA 7.558(23)(a), (c) of the SBT,[2]
claiming that the CAD burdens interstate com-
merce, and thereby violates the Commerce Clause
of the United States Constitution[3] by discriminat-
ing against non-Michigan-based companies and
favoring Michigan-based companies.[4]

On July 13, 1989, the Court of Claims held that
the CAD was unconstitutional. The court stated

[1] A complaint with respect to the year 1981 was filed in the Court
of Claims on December 10, 1984. A complaint with respect to the
years 1982 through 1984 was filed in the Court of Claims on
March 12, 1987. These cases were subsequently consolidated on
May 28, 1987.

[2] Caterpillar also challenged the constitutionality of the SBT's three-
factor formula for apportionment of a company's tax base pursuant to
SBT §§ 41 and 45. Caterpillar claimed that it was entitled to a refund
of taxes pursuant to SBT § 69 because the application of the three-
factor apportionment formula did not fairly represent Caterpillar's
business activities in Michigan and, thus, violated the Due Process
and Equal Protection Clauses of the United States Constitution.
Before a decision by the Court of Claims, Chief Circuit Judge Michael
G. Harrison issued an administrative order holding in abeyance all
cases involving such claims pending action by the Supreme Court in
Trinova Corp v Dep't of Treasury. We eventually upheld the constitu-
tionality of the SBT and its three-factor apportionment formula in
Trinova Corp v Dep't of Treasury, 433 Mich 141; 445 NW2d 428
(1989), and the United States Supreme Court affirmed, Trinova Corp v
Michigan Dep't of Treasury, 498 US 358; 111 S Ct 818; 112 L Ed 2d
884 (1991).
On November 10, 1988, a joint motion was filed by the parties
requesting that the Court of Claims decide separately Caterpillar's
remaining claim that the CAD was unconstitutional. On November 16,
1988, the Court of Claims granted the motion.

[3]   The Congress shall have Power . . . To regulate Commerce
with foreign Nations, and among the several States, and with
the Indian Tribes . . . . [US Const, art I, § 8, cl 3.]

[4] Caterpillar's term "Michigan-based" company means a multistate
company with the predominant part of its facilities and employees in
Michigan in comparison to its sales. The term "non-Michigan based"
company refers to a multistate company with large out-of-state opera-
tions (companies whose facilities and employees in Michigan are less
predominant in comparison to its sales in the state). Neither term
describes a Michigan company that operates exclusively within the
state—an intrastate company.

that the CAD discriminates against out-of-state corporations in a way that has been consistently ruled unconstitutional by the United States Supreme Court on the ground that it violates the Commerce Clause. The court cited the following cases in support of this contention: *Halliburton Oil Well Cementing Co v Reily,* 373 US 64; 83 S Ct 1201; 10 L Ed 2d 202 (1963), *Nippert v Richmond,* 327 US 416; 66 S Ct 586; 90 L Ed 760 (1946), *American Trucking Ass'ns, Inc v Scheiner,* 483 US 266; 107 S Ct 2829; 97 L Ed 2d 226 (1987), and *Westinghouse Electric Corp v Tully,* 466 US 388; 104 S Ct 1856; 80 L Ed 2d 388 (1984). The court further ruled that the discriminatory effect of the CAD should be remedied by disallowing the application of the CAD for any taxpayer, and thus the court acted to sever subsections 23(a) and (c) from the SBT.[5] The court ruled, however, that its deci-

[5] The statutory language of the CAD is stated as follows:

After allocation as provided in section 40 or apportionment as provided in section 41, the tax base shall be adjusted by the following:

(a) Deduct the cost, including fabrication and installation, paid or accrued in the taxable year of tangible assets of a type which are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes excluding costs of assets which are defined in section 1250 of the internal revenue code, except that for tangible assets which are subject to a lease back agreement under section 168(f)(8) of the internal revenue code, the deduction shall be allowed only to the lessee or sublessee as the case may be under the 168(f)(8) agreement. *This deduction shall be multiplied by a fraction, the numerator of which is the payroll factor plus the property factor and the denominator of which is 2.*

\* \* \*

(c) Deduct the cost, including fabrication and installation, excluding the cost deducted under subdivision (a) paid or accrued in the taxable year of tangible assets of a type which are, or under the internal revenue code will become eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes, *provided that the assets are physically located in Michigan.* [MCL 208.23; MSA 7.558(23). Emphasis added.]

sion would apply only to taxable years beginning after September 30, 1989, thus granting prospective relief only.

Caterpillar appealed the Court of Claims decision to grant prospective relief only and to sever the CAD in its entirety from the SBT. On February 5, 1991, the Court of Appeals entered its decision, 188 Mich App 621; 470 NW2d 80 (1991), noting first that it was not ruling on the issue whether the CAD violates the Commerce Clause of the United States Constitution.[6] In regard to the other issues, the Court affirmed the Court of Claims decision to grant prospective relief only, but modified its decision in regard to the specific relief granted. The Court of Appeals held that instead of severing the CAD in its entirety, only that language that produces the discriminatory effect should be removed from the SBT.[7]

Caterpillar filed an application for leave to ap-

---

[6] The Court stated that because the defendant did not cross appeal the Court of Claims ruling in regard to the CAD's constitutionality, that issue was not before the Court. Without decrying this decision by the Court of Appeals, we find that the issue of constitutionality of the CAD is justly before us. Although defendant did not cross appeal the finding of unconstitutionality, a review of the record in this case reveals that defendant's brief in the Court of Appeals did include the argument that the CAD was constitutional; thus, it is worth noting that defendant did make a positive effort to argue constitutionality in the Court of Appeals. More importantly, however, we find that it is within this Court's jurisdiction to review this issue sua sponte. "The Supreme Court may, at any time, in addition to its general powers . . . enter any judgment or order that ought to have been entered, and enter other and further orders and grant relief as the case may require . . . ." MCR 7.316(A)(7). See also MCR 7.302(F)(4)(a), which states that an appeal "shall be limited to the issues raised in the application for leave to appeal," *unless otherwise ordered by the Court.* Review and analysis of a decision by a level of the judiciary finding an enactment of the legislative branch to be in violation of constitutional prescriptions (especially in the area of state tax policy) is justified in order to ensure that the proper balance remains between the two branches of government. Careful review of constitutional issues by this Court cannot be logically or legitimately viewed as overreaching.

[7] See the emphasized portions of the statutory language of the CAD in n 5.

peal, and the Department of Treasury filed an application for leave to appeal as cross-appellant. On October 4, 1991, we granted both applications and limited the appeals to the following issues: (1) whether, before the passage of 1991 PA 77,[8] the CAD provisions violated US Const, art I, § 8, cl 3, if so, (2) whether the lower courts erred by limiting the effect of their rulings to tax years beginning after September 30, 1989, and (3) what relief, if any, plaintiff-appellant should receive. 439 Mich 860.

## II. CAPITAL ACQUISITION DEDUCTION

To better understand the issues implicated in this case, we move next to a discussion of the CAD. It is important to note that the CAD is not an isolated tax statute, but is part of an overall tax scheme that represents a policy choice adopted by the state Legislature. This tax scheme is the SBT. The SBT, enacted by the Legislature in 1975,[9] was "new and experimental legislation in this state." *Town & Country Dodge, Inc v Dep't of Treasury,* 420 Mich 226, 234; 362 NW2d 618 (1984).[10] The SBT is a consumption-type value-added tax. See *Mobil Oil v Dep't of Treasury,* 422 Mich 473, 496, and n 14; 373 NW2d 730 (1985). It is not, however, a pure value-added tax because it is subject to various exemptions, exclusions, and industry-specific ad-

[8] The CAD provisions of the SBT were amended upon passage of 1991 PA 77. The act was ordered to take immediate effect. Caterpillar's claims, however, concern only the years 1981 through 1984. Therefore, for the purposes of this case, our discussion and analysis of the CAD are limited to the statutory language of the CAD in effect 1981 through 1984. See n 5 *supra.*

[9] The SBT became effective January 1, 1976.

[10] Since its enactment, there have been several challenges to the SBT on constitutional and other grounds. In each case, the validity of the SBT was upheld. See *Stockler v Dep't of Treasury,* 75 Mich App 640; 255 NW2d 718 (1977); *Town & Country Dodge, supra; Trinova,* n 2 *supra,* 433 Mich 141; *Trinova,* n 2 *supra,* 111 S Ct 818.

justments.[11] Under the SBT, the first step in determining a taxpayer's tax liability is to determine its tax base. This tax base is defined as business income before apportionment subject to certain adjustments. MCL 208.9; MSA 7.558(9). The tax base is then apportioned between Michigan and other states in which the taxpayer conducts business activities. MCL 208.40, 208.41, 208.45; MSA 7.558(40), 7.558(41), 7.558(45). This is done by using a three-factor apportionment formula.[12] After apportionment, the tax base is subject to several additional adjustments.[13] One such adjustment is the CAD.

The CAD does just what its name suggests. It provides a deduction for the acquisition of capital assets. Following the general principles of consumption-type value-added tax treatment, the CAD allows the taxpayer's tax base to be reduced by the amount expended during the tax year to acquire capital assets. See Kasischke, *Computation of the*

[11] See *Trinova,* n 2 *supra,* 111 S Ct 823-826; *Trinova,* n 2 *supra,* 433 Mich 149-153; and Kasischke, *Computation of the Michigan single business tax: Theory and mechanics,* 22 Wayne L R 1069 (1976), for further explanation and review of the SBT.

[12] [I]f a taxpayer does business both within and without Michigan, it must determine the portion of its total value added attributable to Michigan. That portion . . . is the average of three ratios: (1) Michigan payroll to total payroll, (2) Michigan property to total property, and (3) Michigan sales to total sales. Mich Comp Laws §§ 208.45, 208.46, 208.49, 208.51 (1979). The total tax base is multiplied by the portion of business activity attributable to Michigan (under the three-factor formula), and the result, subject to several further adjustments, is the taxpayer's "adjusted tax base." § 208.31(2). [*Trinova,* n 2 *supra,* 111 S Ct 826.]

[13] For example, MCL 208.23, 208.31(2), 208.31(5), 208.35, 208.38, 208.39; MSA 7.558(23), 7.558(31)(2), 7.558(31)(5), 7.558(35), 7.558(38), 7.558(39). See Kasischke, *Computation of the Michigan single business tax,* n 11 *supra* at 1082-1094. Under the current language of the SBT, subsection 31(5) is listed as subsection 31(4). However, to be consistent with our reference to this subsection in relation to the Kasischke article, we cite the subsection as it was listed at the relevant time.

*Michigan single business tax: Theory and mechanics,* 22 Wayne L R 1069 (1976). This consumption-type element of the CAD and SBT thereby provides a cash-flow advantage to the purchaser/user of capital assets. The CAD allows the purchaser/user to increase its cash flow by reducing its tax liability through the deduction. Such a tax policy may help to encourage Michigan-related investments and may provide an economic stimulus to certain parts of the business sector due to the increase in cash flow.[14]

The deduction provided by the CAD is not applied to the tax base until after the tax base has been allocated or apportioned. MCL 208.23; MSA 7.558(23). Since the tax base after apportionment represents only Michigan business activity, only capital acquisitions related to Michigan business activity should qualify for treatment pursuant to the CAD. The CAD (subsections 23[a] and 23[c]) is designed to accomplish this result. Subsections 23(a) and 23(c) provide methods of apportioning a taxpayer's capital acquisitions so that only those acquisitions that relate to Michigan business activity are included in the CAD. Apportioning the CAD for tangible personal property[15] is accomplished in subsection 23(a). Apportioning the CAD for real property[16] is accomplished in subsection 23(c).[17]

Under subsection 23(a), the deduction for tangible personal property is available for any tax-

[14] Whether such encouragement or stimulus occurs may depend on numerous other factors that affect business decisions and choices. A description and analysis of such factors are not, however, necessary for the resolution of the issue before us. We mention this only to draw attention to the fact that we can never analyze business behavior in relation to tax schemes in a theoretical vacuum.

[15] Tangible personal property means tangible personal property as defined by the SBT and CAD.

[16] Real property means real property as defined by the SBT and CAD.

[17] See n 5.

payer, whether a multistate company[18] or a company whose business activity is allocated entirely to Michigan[19]—an in-state company. Furthermore, subsection 23(a) does not limit the CAD for tangible personal property to only those assets located in Michigan. Because tangible personal property is readily transportable, it is not that easy to determine where tangible personal property is actually located, or how or if such location should be or is solely determinative of its proper use in the CAD. The Legislature recognized that it could not reach such a determination without imposing burdensome accounting problems upon the taxpayers and upon the Michigan taxing system itself. In response to these problems, the Legislature, following traditional taxing policy and practice of state legislatures, adopted an apportionment formula to calculate the CAD for tangible personal property related to Michigan business activities. The apportionment formula adopted was a two-factor formula. To figure out the CAD for tangible personal property, the total cost of the tangible personal property acquired during the tax year (regardless of whether it is purchased in Michigan) is multiplied by the average of the property factor and the payroll factor.[20]

The two-factor formula used in subsection 23(a)

---

[18] See MCL 208.41; MSA 7.558(41).

[19] See MCL 208.40; MSA 7.558(40).

[20]

$$X = \text{property factor} = \frac{\text{taxpayer's Michigan property}}{\text{taxpayer's total property}}$$

$$Y = \text{payroll factor} = \frac{\text{taxpayer's Michigan payroll}}{\text{taxpayer's total payroll}}$$

TPP = total acquisition of tangible personal property during the tax year

$$CAD = TPP \times \frac{(X + Y)}{2}$$

Obviously, for a person subject to tax only in Michigan (an in-state company), a full deduction will result.

is obviously not the same as the three-factor formula used in computing a taxpayer's tax base attributable to Michigan.[21] The theory behind the use of the two-factor apportionment formula in subsection 23(a) is that the acquisition of the capital is most likely to be located where a company's property and payroll (employees) are located. The sales factor used in the three-factor formula is excluded on the premise that while a taxpayer's investment in productive capacity (capital assets) follows the taxpayer's existing investment in property and labor, it does not necessarily follow the location of its sales.[22]

As with subsection 23(a), under subsection 23(c) the deduction for real property is available for any taxpayer, whether a multistate company or a company whose business activity is allocated entirely to Michigan—an in-state company. The method of apportionment, however, is much more simple. Location of real property is obvious and does not involve accounting problems. Moreover, investment in real property is considered to be directly related to productive capacity. Therefore, subsection 23(c) provides a one hundred percent deduction for the cost of real property "provided that the assets are physically located in Michigan."

The lack of symmetry between the three-factor apportionment formula used for calculating the SBT tax base and the two-factor apportionment formula used under subsection 23(a) of the CAD is ultimately the basis for Caterpillar's constitutional challenge[23] of the CAD.[24]

---

[21] Compare ns 12 and 20.

[22] See Kasischke, *Computation of the Michigan single business tax, supra* at 1084.

[23] Ironically, Caterpillar originally also challenged the fairness of the three-factor apportionment formula (see n 2).

[24] Caterpillar has made some brief argument in regard to its dis-

### III. ANALYSIS

When considering the constitutional challenge presented by Caterpillar and reviewing the decisions of the lower courts in this case, we begin our analysis by recognizing that, in regard to such issues, we are guided by several well-established principles of law that frame our inquiry. *Johnson v Harnischfeger Corp,* 414 Mich 102, 112; 323 NW2d 912 (1982). Legislation that is challenged on constitutional grounds is "clothed in a presumption of constitutionality." *Cruz v Chevrolet Grey Iron Div of General Motors Corp,* 398 Mich 117, 127; 247 NW2d 764 (1976). A statute is presumed constitutional absent a clear showing to the contrary. *Lehnhausen v Lake Shore Auto Parts,* 410 US 356; 93 S Ct 1001; 35 L Ed 2d 351 (1973). "[I]t is the duty of the Court to give the presumption of constitutionality to a statute and construe it as constitutional unless the contrary clearly appears." *People v McQuillan,* 392 Mich 511, 536; 221 NW2d 569 (1974). The presumption of constitutionality is especially strong with respect to taxing statutes. *Ludka v Dep't of Treasury,* 155 Mich App 250, 264; 399 NW2d 490 (1986), citing *O'Reilly v Wayne Co,* 116 Mich App 582, 591; 323 NW2d 493 (1982). State legislatures have great discretionary latitude in formulating taxes. *Wisconsin v J C Penney Co,* 311 US 435, 444-445; 61 S

favor of subsection 23(c), but has clearly emphasized subsection 23(a) in its challenge to the CAD in this case. Similarly, the lower court analysis of the CAD's constitutionality focuses entirely on subsection 23(a). *Caterpillar, Inc v Dep't of Treasury,* unpublished opinion of the Court of Claims, decided July 13, 1989 (Docket Nos. 84-9664-CM and 87-11109-CM). The only times that the Court of Claims made any explicit reference to subsection 23(c) are in its order of final judgment entered August 11, 1989, and in its clarification of final judgment entered August 24, 1989.

Ct 246; 85 L Ed 267 (1940).[25] "The legislature must
determine all questions of State necessity, discre-
tion or policy in ordering a tax and in apportion-
ing it. 1 Cooley, Taxation (4th ed), § 67. And the
judicial tribunals of the State have no concern
with the policy of State taxation determined by
the legislature. 1 Cooley, Taxation (4th ed), § 67."
*C F Smith Co v Fitzgerald,* 270 Mich 659, 670; 259
NW 352 (1935) (cited for support in *Stockler v
Dep't of Treasury,* 75 Mich App 640, 644; 255
NW2d 718 [1977]). See also *Bowerman v Sheehan,*
242 Mich 95, 97-98; 219 NW 69 (1928). A taxpayer
challenging a tax on constitutional grounds must
overcome a strong presumption in favor of the

---

[25] The Constitution is not a formulary. It does not demand of
states strict observance of rigid categories nor precision of
technical phrasing in their exercise of the most basic power of
government, that of taxation. For constitutional purposes the
decisive issue turns on the operating incidence of a challenged
tax. A state is free to pursue its own fiscal policies, unembar-
rassed by the Constitution, if by the practical operation of a tax
the state has exerted its power in relation to opportunities
which it has given, to protection which it has afforded, to
benefits which it has conferred by the fact of being an orderly,
civilized society.

*       *       *

This analysis is merely a reformulation of the classic ap-
proach of this Court to the taxing power of the states. *Law-
rence v State Tax Commission* [286 US 276, 280; 52 S Ct 556; 76
L Ed 1102 (1932)]. Ambiguous intimations of general phrases in
opinions torn from the significance of concrete circumstances,
or even occasional deviations over a long course of years, not
unnatural in view of the confusing complexities of tax prob-
lems, do not alter the limited nature of the function of this
Court when state taxes come before it. At best, the responsibil-
ity for devising just and productive sources of revenue chal-
lenges the wit of legislators. Nothing can be less helpful than
for courts to go beyond the extremely limited restrictions that
the Constitution places upon the states and to inject themselves
in a merely negative way into the delicate processes of fiscal
policy-making. We must be on guard against imprisoning the
taxing power of the states within formulas that are not com-
pelled by the Constitution but merely represent judicial gener-
alizations exceeding the concrete circumstances which they
profess to summarize.

taxing statute's validity and point out with specificity the constitutional provision that is violated. *Penn Mut Life Ins Co v Dep't of Licensing & Regulation,* 162 Mich App 123; 412 NW2d 668 (1987); *Huron-Clinton Metropolitan Auth'y v Bd of Supervisors of Five Counties,* 300 Mich 1, 12; 1 NW2d 430 (1942); *Young v Ann Arbor,* 267 Mich 241, 243; 255 NW 579 (1934). A taxing statute must be shown to " 'clearly and palpably violate[ ] the fundamental law' " before it will be declared unconstitutional. *O'Reilly, supra* at 592, citing *Thoman v Lansing,* 315 Mich 566, 576; 24 NW2d 213 (1946). With these essential principles in mind, we address the constitutional challenge presented in this case.

The United States Supreme Court, cognizant of these essential principles and equally mindful of and responsive to Commerce Clause dictates, has established a four-pronged test to determine whether a state tax violates the Commerce Clause. *Complete Auto Transit, Inc v Brady,* 430 US 274, 279; 97 S Ct 1076; 51 L Ed 2d 326 (1977). A state tax will withstand scrutiny under a Commerce Clause challenge and will be held to be constitutionally valid under the four-pronged test articulated in *Complete Auto* provided that the tax: (1) is applied to an activity having a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state.[26] We now apply this four-pronged test to the CAD.

[26] Since the *Complete Auto* decision, the four-pronged test has been applied on numerous occasions. See, e.g., *Trinova,* n 2 *supra,* 111 S Ct 818; *Goldberg v Sweet,* 488 US 252; 109 S Ct 582; 102 L Ed 2d 607 (1989); *Amerada Hess Corp v New Jersey Dep't of the Treasury,* 490 US 66; 109 S Ct 1617; 104 L Ed 2d 58 (1989); *American Trucking Ass'ns, Inc v Scheiner, supra; Maryland v Louisiana,* 451 US 725; 101 S Ct 2114; 68 L Ed 2d 576 (1981).

### A. SUBSTANTIAL NEXUS

The first prong of the *Complete Auto* test requires us to determine whether the SBT through the CAD provisions is applied to an activity having a substantial nexus with Michigan. "The requisite 'nexus' is supplied if [Caterpillar] avails itself of the 'substantial privilege of carrying on business' within the State . . . ." *Mobil Oil Corp v Comm'r of Taxes of Vermont,* 445 US 425, 437; 100 S Ct 1223; 63 L Ed 2d 510 (1980). See also *Exxon Corp v Wisconsin Dep't of Revenue,* 447 US 207, 220; 100 S Ct 2109; 65 L Ed 2d 66 (1980). Furthermore, "[t]he fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax" and business activities with the state. *J C Penney, supra* at 445. "[V]isible territorial boundaries do not always establish the limits of a state's taxing power or jurisdiction. . . . If there is some jurisdictional fact or event to serve as a conductor, the reach of the state's taxing power may be carried to objects of taxation beyond its borders." *Miller Bros Co v Maryland,* 347 US 340, 342-343; 74 S Ct 535; 98 L Ed 744 (1954). Thus, to allow a state to impose a tax on interstate activities, there must be some minimal connection between those activities and the taxing state. See *Moorman Mfg Co v Bair,* 437 US 267, 273; 98 S Ct 2340; 57 L Ed 2d 197 (1978); *Container Corp v Franchise Tax Bd,* 463 US 159, 165-166; 103 S Ct 2933; 77 L Ed 2d 545 (1983); *Mobil Oil, supra,* 445 US 436-437. To establish the requisite nexus under the constitution, it must simply be determined whether there exists "some definite link, some minimum connection, between [the state and the business activities] it seeks to tax." *Miller Bros, supra* at 344-345. See also *Nat'l Bellas Hess, Inc v Illinois Dep't of Revenue,* 386

US 753, 756; 87 S Ct 1389; 18 L Ed 2d 505 (1967); *Nat'l Geographic Society v California Bd of Equalization,* 430 US 551, 561; 97 S Ct 1386; 51 L Ed 2d 631 (1977). It is clear from the facts as set forth in this case that Caterpillar conducts a portion of its business in Michigan.[27] Thus, we are persuaded that there exists some definite link, some minimum connection, between Michigan and Caterpillar's business activities that it seeks to tax. Therefore, we find that the SBT through the CAD provisions is applied to an activity having a substantial nexus with Michigan. Having concluded that a sufficient Michigan connection exists, the first prong of the *Complete Auto* test is plainly satisfied.

### B. FAIR APPORTIONMENT

We turn next to the second prong of the *Complete Auto* test to determine whether the CAD provisions of the SBT are fairly apportioned. Fair apportionment requires that each state tax only its fair share of interstate business activity. *Goldberg v Sweet,* 488 US 252, 260-261; 109 S Ct 582; 102 L Ed 2d 607 (1989). The function of apportionment is to determine what portion of a multistate company's business activity can be fairly attributed to the taxing state. *Trinova v Dep't of Treasury,* 433 Mich 141, 157; 445 NW2d 428 (1989). See also *Shell Oil Co v Iowa Dep't of Revenue,* 488 US 19; 109 S Ct 278; 102 L Ed 2d 186 (1988). This determination "is often an elusive goal, both in theory and in practice." *Container Corp, supra* at

---

[27] Caterpillar's business activities in Michigan during the years 1981 through 1984 consisted of the following: the employment of from two to five sales representatives who were residents of Michigan, the ownership interest in patterns and tooling used by unrelated third-party Michigan suppliers in the manufacture and production of parts purchased by Caterpillar, the leasing of a forklift truck, and the sales of products shipped into Michigan.

164. However, while formula apportionment cannot guarantee a perfect result, "the constitution requires neither a perfect formula nor a perfect apportionment." *Trinova, supra,* 433 Mich 162. Moreover, separate geographical accounting has been held to offer no better solution to computation of taxation of interstate activity. See *Container Corp, supra* at 181. Therefore, state legislatures have been allowed wide latitude in determining whether formula apportionment provides the best method available to their respective states in deciding how to tax the state's fair share of interstate business activity. *Moorman, supra* at 272-273.

The United States Supreme Court has long upheld the constitutionality of formula apportionment. See, e.g., *Moorman, supra; Butler Bros v McColgan,* 315 US 501; 62 S Ct 701; 86 L Ed 991 (1942); *Hans Rees' Sons, Inc v North Carolina,* 283 US 123; 51 S Ct 385; 78 L Ed 879 (1931); *Bass, Ratcliff & Gretton, Ltd v State Tax Comm,* 266 US 271; 45 S Ct 82; 69 L Ed 282 (1924); *Underwood Typewriter Co v Chamberlain,* 254 US 113; 41 S Ct 45; 65 L Ed 165 (1920). In upholding the constitutionality of formulary apportionment, "the United States Supreme Court has refused to require the use of one formula to the exclusion of all others." *Trinova, supra,* 433 Mich 157. Furthermore, the Court has "declined to undertake the essentially legislative task of establishing a 'single constitutionally mandated method of taxation.'" *Goldberg, supra* at 261. See also *Trinova v Michigan Dep't of Treasury,* 498 US 358, —; 111 S Ct 818, 836; 112 L Ed 2d 884 (1991). The only constitutional requirement for apportionment is that it be fair. *Container Corp, supra.*

A determination whether apportionment is fair in a given case has most recently required analyzing two components of fairness. The first compo-

nent of fairness focuses on the structure of the tax. This component requires that the tax structure be internally consistent. "To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result," *Goldberg, supra* at 261, or, in other words, no more than one hundred percent of the taxpayer's business activity would be taxed. Under subsection 23(a) of the CAD, Caterpillar would receive a CAD for one hundred percent of its acquired tangible personal property, divided among the states in which it has property and payroll.[28] Similarly, under subsection 23(c) of the CAD, Caterpillar would receive a CAD for one hundred percent of its acquired real property. Under subsection 23(c), Caterpillar would receive a CAD in each state for all of the real property it acquired in that state.[29] We conclude, therefore, that the internal consistency component of fairness is satisfied.

The second component of fairness for apportionment focuses on the relationship between the factors used to determine apportionment and the activity that is being apportioned. This component requires that the apportionment be externally consistent. External consistency requires that the choice of factors used in apportionment "reasonably reflects the in-state component of the activity being [apportioned]." *Goldberg, supra* at 262. Subsection 23(a) of the CAD uses a two-factored apportionment formula. The two factors used are the property factor and the payroll factor. The theory behind the decision to use these specific factors, as opposed to other factors, is that the acquisition of the capital is most likely to be located where a company's property and payroll (employees) are

---

[28] See discussion of subsection 23(a), *ante,* pp 410-412.

[29] See discussion of subsection 23(c), *ante,* p 412.

located. The sales factor used in the three-factor formula is excluded on the premise that while a taxpayer's investment in productive capacity (capital assets) follows the taxpayer's existing investment in property and labor, it does not necessarily follow the location of its sales. See *ante,* pp 411-412. We are persuaded that the reasoning provided by this theory makes it clear that the choice of factors used in subsection 23(a) of the CAD reasonably reflects capital acquisitions related to Michigan business activity.

In so concluding, we are not deciding that the two-factor apportionment formula *best* reflects the in-state component of capital acquisitions of tangible personal property, nor are we obliged to make such a determination. See *Trinova, supra,* 111 S Ct 834. We need only find that the two-factor apportionment formula *reasonably* reflects the in-state component of capital acquisitions of tangible personal property. To make this determination we are not required to find that the formula results in the precise or actual in-state component of capital acquisitions of tangible personal property. Formulas that have been found to provide only a rough approximation have been upheld. *Moorman, supra* at 272. See also *Trinova, supra,* 111 S Ct 833; *Amerada Hess Corp v New Jersey Dep't of Treasury,* 490 US 66, 75; 109 S Ct 1617; 104 L Ed 2d 58 (1989). Indeed, apportionment formulas inherently overreflect or underreflect the in-state component of the interstate business activity being taxed. Despite this imprecision, the United States Supreme Court has consistently held that such formulas reasonably reflect the in-state component of the interstate business activity being taxed. See *Moorman, supra* at 272-273.

Therefore, because we have found that the two-factor apportionment formula reasonably reflects

the Michigan component of the capital acquisitions of tangible personal property made by Caterpillar, we need not determine whether the use of a three-factor apportionment formula would produce a more fair or precise result. Such a determination is better and more appropriately left to the Michigan Legislature.[30] See *Trinova, supra,* 111 S Ct 818; *Moorman, supra.*

Under subsection 23(c), the sole factor considered in apportioning the CAD is the physical location of the real property acquired. As stated previously in this opinion, *ante,* p 412, this was done because the location of real property is obvious, and because investment in real property is directly related to productive capacity. We find, on the basis of this reasoning, that the choice of factors used in subsection 23(c) of the CAD reasonably reflects capital acquisitions related to Michigan business activity. Thus, the external consistency component of fairness is satisfied.

In *Trinova, supra,* 433 Mich 160, this Court stated:

> [T]he test for fair apportionment is not whether a formula results in inadequate or even inaccurate apportionment. The test is whether the use of a particular method of apportionment results in business activity being attributed to this state which is "out of all appropriate proportions" to the taxpayer's intrastate business activity, or has "led to a grossly distorted result."

The burden of showing that a tax is not fairly apportioned is on the taxpayer. See *Trinova, supra,* 433 Mich 158. See also *Trinova,* 111 S Ct 832, *Container Corp,* and *Moorman, supra.* No facts presented in this case evidence any substantial

[30] See n 25.

misappropriation or any such distorted result. Therefore, we find that the methods of apportionment under the CAD, satisfying the requirements of both internal consistency and external consistency, meet the test for fair apportionment. Thus, we conclude that the second prong of the *Complete Auto* test is satisfied.

### C. DISCRIMINATION

We turn next to the third prong of the *Complete Auto* test to determine whether the CAD provisions of the SBT discriminate against interstate commerce. Interstate commerce is not immune from state taxation and may constitutionally be made to pay its way. See *Complete Auto, supra.* However, "the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by [unduly] burdening out-of-state competitors." *New Energy Co of Indiana v Limbach,* 486 US 269, 273-274; 108 S Ct 1803; 100 L Ed 2d 302 (1988). See also *Boston Stock Exchange v State Tax Comm,* 429 US 318, 329; 97 S Ct 599; 50 L Ed 2d 514 (1977). A tax violates the third prong of the *Complete Auto* test if it is facially discriminatory, has a discriminatory purpose, *or* has the effect of unduly burdening interstate commerce. See *Amerada Hess, supra* at 75.

### 1. FACIAL DISCRIMINATION

The CAD is available for any taxpayer, whether a multistate company or a company whose business activity is allocated entirely to Michigan—an in-state company. This is true under both subsections 23(a) and 23(c). Therefore, Caterpillar cannot point to any treatment of in-state and out-of-state com-

panies that is discriminatory on its face. See *Trinova, supra,* 111 S Ct 835.[31]

## 2. DISCRIMINATORY PURPOSE

Caterpillar claims that the CAD provided in subsection 23(a) is discriminatory because the two-factor apportionment formula excludes consideration of the sales factor used in the three-factor apportionment formula used to calculate the taxpayer's apportioned tax base under the SBT. When the reasons for using the two-factor formula and the three-factor formula in the various parts of the SBT are reviewed, it is clear that a finding of a discriminatory purpose for enacting subsection 23(a) is not required. The three factors used in apportioning the tax base under the SBT—payroll factor, property factor, and sales factor—" 'appear in combination to reflect a very large share of the activities *by which value is generated.*' " *Trinova, supra,* 111 S Ct 833 (emphasis in original). Likewise, the two factors used in apportioning the capital acquisitions of tangible personal property under subsection 23(a)—payroll factor, property factor—appear to reasonably reflect the in-state component of capital acquisitions of tangible personal property. See part III(B) of our opinion, *ante,* pp 417-422. Formulas used in apportioning a value-added tax base and a deduction provided for acquisitions of capital are not constitutionally required to be identical. There is no constitutional requirement that different provisions of a taxing statute be in any way symmetrical. Therefore, we cannot conclude that the use of two different

---

[31] Although the Court's analysis in *Trinova* was based on review of the SBT as a whole and not on the CAD provisions specifically, the Court expressly stated that the CAD provisions were relevant to the Court's analysis and review of the SBT's constitutionality. See *Trinova, supra,* 111 S Ct 826 and 835-836.

apportionment formulas in the SBT evidences any discriminatory purpose.

Caterpillar also urges that subsection 23(c) is discriminatory because it was enacted to promote investment in Michigan. In *Trinova, supra,* 111 S Ct 835, the United States Supreme Court held that the promotion of development and investment of business in Michigan does not violate the Commerce Clause.

> It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing state. States are free to "structur[e] their tax systems to encourage the growth and development of intrastate commerce and industry." *Boston Stock Exchange, supra,* 429 US 336-337.

Therefore, we do not find discriminatory purpose in the enactment of subsection 23(c).

We conclude, as did the *Trinova* Court, that "all the contemporaneous evidence concerning passage of the SBT suggests a benign motivation, combined with a practical need to increase revenues." *Trinova, supra,* 111 S Ct 835. Furthermore, we do not find "any evidence that the SBT was inspired as a way to export tax burdens or import tax revenues." *Id.,* 111 S Ct 836. Thus, we conclude and more specifically find no discriminatory purpose in the enactment of the CAD.

### 3. DISCRIMINATORY EFFECT

Even if a tax statute is not discriminatory on its face and was not enacted with the intent to discriminate against interstate commerce, it can still be held to violate the Commerce Clause if it is found to have a discriminatory effect on interstate commerce. Caterpillar claims that subsection 23(a)

has the discriminatory effect of favoring Michigan-based companies at the expense of non-Michigan-based companies. Caterpillar claims this discrimination is directly related to the unfair design of the two-factor apportionment formula. In support of its claim, Caterpillar argues that the two-factor apportionment formula discriminates against certain multistate companies like itself who do not have a predominant part of their facilities and employees in Michigan in comparison to their sales, and who therefore receive a smaller CAD than if the sales factor was included in the apportionment formula.

The United States Supreme Court has held that when the different effects of a tax provision on different companies result solely from the differences between the nature of these companies' businesses and not from the location of their activities (i.e., in state or out of state), there exists no discriminatory effect on interstate commerce. See *Amerada Hess, supra* at 78. See also *White v Reynolds Metals Co,* 558 So 2d 373, 389-390 (Ala, 1989). Similarly, a discriminatory effect does not result from fair encouragement of in-state business like that provided by subsection 23(c). See *Armco, Inc v Hardesty,* 467 US 638, 645-646; 104 S Ct 2620; 81 L Ed 2d 540 (1984), and *Boston Stock Exchange, supra* at 336-337.

> The [SBT] does not contain provisions aimed at imposing adverse tax consequences upon multistate taxpayers as a class. Generally speaking, the overall tax consequences to a multistate taxpayer will be dependent upon the nature of its business activities and whether it is eligible and elects to avail itself of the tax reduction incentives afforded by the [SBT]. [Pollock, *Multistate taxpayers under the Single Business Tax Act,* 22 Wayne L R 1101, 1113 (1976).]

We agree with this analysis. Thus, we are persuaded that no discriminatory effect on interstate commerce was imposed on Caterpillar by virtue of the CAD.

The Court of Claims ruled that the CAD has a discriminatory effect on interstate commerce. The court stated that the discriminatory effect of the CAD has been consistently held to be unconstitutional by the United States Supreme Court as violative of the Commerce Clause. We observe, however, that the Court of Claims arrived at its decision without a full and thorough analysis of all four prongs of the *Complete Auto* test. The court, therefore, rendered its decision without any reference to whether the CAD was fairly apportioned. Furthermore, we observe that the decision of the Court of Claims was announced before the decision of the United States Supreme Court in *Trinova* and therefore did not have the benefit of the *Trinova* analysis.

The *Trinova* Court found that the SBT[32] did not discriminate against interstate commerce in violation of the Commerce Clause, distinguishing the SBT from other taxing statutes that it has held to be unconstitutional. The Court stated that under the Michigan tax, there is no treatment of in-state and out-of-state companies that is discriminatory on its face, noting that such facial discrimination was found, however, in *Westinghouse Electric Corp v Tully, Boston Stock Exchange,* and *Halliburton Oil Well Cementing Co v Reily, supra. Trinova, supra,* 111 S Ct 835. Moreover, the Court in *Trinova* stated that while it recognizes that the "Commerce Clause requires more than mere facial neutrality," *id.,* and that " 'the Commerce Clause has a deeper meaning that may be implicated even though state provisions . . . do not allocate tax

---

[32] See n 31.

burdens between insiders and outsiders in a manner that is facially discriminatory,'" *id.,* citing *American Trucking Ass'ns v Scheiner, supra* at 281, "[t]he content of that requirement is fair apportionment" and "[t]he 'deeper meaning' to which *American Trucking* refers is embodied in the requirement of fair apportionment, as expressed in the tests of internal and external consistency." 111 S Ct 835. See also *Container Corp, supra* at 171 ("in the interstate commerce context . . . the antidiscrimination principle has not in practice required much in addition to the requirement of fair apportionment").

Having found that the CAD was fairly apportioned and having reviewed the United States Supreme Court's own interpretation of its prior decisions in *Westinghouse, Boston Stock Exchange, Halliburton,* and *American Trucking,* we find our decision, holding that there is no discriminatory effect on interstate commerce imposed on Caterpillar by virtue of the CAD, to be consistent with prior case law on this issue and warranted in this case.

In sum, the CAD is not *facially* discriminatory, nor does the CAD have a discriminatory *purpose* or *effect.* Therefore, the third prong of the *Complete Auto* test is satisfied.

### D. FAIR RELATION TO SERVICES PROVIDED

The fourth prong of the *Complete Auto* test raises the issue whether the SBT through the CAD provisions is fairly related to the services provided by Michigan. In *Goldberg, supra* at 266-267, the United States Supreme Court provided an explanation of what the fourth prong requires. The Court stated:

The purpose of this test is to ensure that a

State's tax burden is not placed upon [companies] who do not benefit from services provided by the State. *Commonwealth Edison [Co v Montana,* 453 US 609, 627; 101 S Ct 2946; 69 L Ed 2d 884 (1981)].

. . . The tax which may be imposed on a particular interstate transaction need not be limited to the cost of the services incurred by the State on account of that particular activity. *Id.* at 627, n 16. On the contrary, "interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct 'benefit.' " *Ibid.* (emphasis in original). The fourth prong of the *Complete Auto* test thus focuses on the wide range of benefits provided to the taxpayer, not just the precise activity connected to the interstate activity at issue. Indeed, last Term, in *D H Holmes [Co, Ltd v McNamara,* 486 US 24, 32; 108 S Ct 1619; 100 L Ed 2d 21 (1988)], we noted that a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisfied the requirement that the tax be fairly related to benefits provided by the State to the taxpayer.

Caterpillar's business activities in Michigan during the years 1981 through 1984 consisted of the following: the employment of from two to five sales representatives who were residents of Michigan, the ownership interest in patterns and tooling used by unrelated third-party Michigan suppliers in the manufacture and production of parts purchased by Caterpillar, the leasing of a forklift truck, and the sales of products shipped into Michigan. In light of Caterpillar's business activity in Michigan, we find that Caterpillar has received the benefits of a "civilized society" that Michigan provides, as characterized by the Court in *Goldberg, supra.* Therefore, we find that the SBT through the

CAD provisions is fairly related to the services provided by Michigan. Thus, the fourth prong of the *Complete Auto* test is satisfied.

### IV. CONCLUSION

In summary, we find that the capital acquisition deduction, MCL 208.23(a), (c); MSA 7.558(23)(a), (c) of the Single Business Tax Act, as it was in effect in relation to the challenge before us,[33] satisfies all four prongs of the *Complete Auto* test. Therefore, we hold that the CAD does not violate the Commerce Clause, US Const, art I, § 8, cl 3.[34] Thus, we reverse the decisions of the Court of Claims and the Court of Appeals. We need not address the remaining issues because our decision on the Commerce Clause issue is dispositive.

BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

CAVANAGH, C.J. (*dissenting*). In *Trinova Corp v Dep't of Treasury*, 433 Mich 141; 445 NW2d 428 (1989), aff'd 498 US 358; 111 S Ct 818; 112 L Ed 2d 884 (1991), this Court and the United States Supreme Court upheld the three-factor apportionment formula of Michigan's Single Business Tax

---

[33] See n 8.

[34] Furthermore, it can be concluded that the CAD does not violate the Due Process Clause of the Fourteenth Amendment. "For a State to tax . . . interstate commerce, the Due Process Clause of the Fourteenth Amendment imposes two requirements: a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil, supra,* 445 US 436-437. The first and second prongs of the *Complete Auto* test encompass these requirements of the Due Process Clause. Therefore, because the CAD satisfies all four prongs of the *Complete Auto* test, it necessarily satisfies the requirements of due process. See *Amerada Hess, supra.*

Act (SBT).[1] This case presents the distinct question whether, in light of the underlying SBT apportionment, the different apportionment formulas formerly applied to the capital acquisition deduction (CAD) provision of the SBT[2] discriminate against interstate commerce in violation of the Commerce Clause, US Const, art I, § 8, cl 3.[3]

The majority concludes that the CAD apportionment does not discriminate against interstate commerce. My Brother BRICKLEY concludes that the apportionment of the personal property component of the CAD does discriminate, but that the apportionment of the real property component does not. I agree with Justice BRICKLEY's result with regard to the apportionment of the personal property CAD, although on the basis of significantly different analysis. I also believe, contrary to the results of both Justice BRICKLEY and the majority, that the proper analysis requires the conclusion that the real property CAD apportionment is equally unconstitutional.

In my view, the apportionment formulas applied both to the personal property and real property

[1] MCL 208.45; MSA 7.558(45), as enacted before 1991 PA 77. The Legislature amended the three-factor formula in 1991 PA 77, but this would not appear to be relevant to the issue in this case.

[2] MCL 208.23(a), (c); MSA 7.558(23)(a), (c), as enacted before 1991 PA 77. For the sake of convenience, I henceforth refer in this opinion to the challenged CAD apportionment in the present tense, even though it has now been superseded by amendments adopted by the Legislature in response to the lower court decisions in this case. See 1991 PA 77; 1991 PA 128; see also n 10.

[3] The majority appears to suggest that the United States Supreme Court may have already upheld the CAD apportionment against Commerce Clause challenge, as part of the overall scheme of the SBT, in *Trinova*. See *ante*, pp 423, n 31, and 426, n 32. If this is what the majority intends to suggest, the suggestion is plainly erroneous. It is true that the Court in *Trinova* addressed and rejected a claim that the three-factor apportionment of the SBT itself discriminated against interstate commerce. See *Trinova*, 112 L Ed 2d 911-912. The Court clearly was not presented with any challenge to the apportionment of the CAD, however, and the majority's citation of *Trinova* in this regard is thus plainly inapposite.

components of the CAD discriminate against interstate commerce on their face and in their inevitable effect. Indeed, the CAD apportionment scheme, when analyzed carefully in light of the underlying apportionment formula applied to the SBT itself, is revealed to be a subtle but classic example of interstate economic protectionism forbidden by the Commerce Clause. I therefore respectfully dissent.

## I. COMMERCE CLAUSE ANALYSIS

### A. GENERAL PRINCIPLES

The United States Supreme Court recently summarized its Commerce Clause jurisprudence as follows:

> The Commerce Clause of the United States Constitution provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States . . . ." Art I, § 8, cl 3. It is long-established that, while a literal reading evinces a grant of power to Congress, the Commerce Clause also directly limits the power of the States to discriminate against interstate commerce. "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." When a state statute clearly discriminates against interstate commerce, it will be struck down, unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. Indeed, when the state statute amounts to simple economic protectionism, a "virtually per se rule of invalidity" has applied. [*Wyoming v Oklahoma,* 502 US —; 112 S Ct 789; 117 L Ed 2d 1, 22 (1992). Citations omitted.]

It is well established, of course, that the prohibition of discrimination against interstate commerce

applies to tax as well as regulatory legislation. One of the earliest leading Commerce Clause cases involved a discriminatory license tax imposed on vendors of goods made out of state. The United States Supreme Court struck down the tax, holding that the Commerce Clause was designed to guard against "all the evils of discriminating State legislation, favorable to the interests of one State and injurious to the interests of other states and countries, which existed previous to the adoption of the Constitution . . . ." *Welton v Missouri,* 91 US (23 Wall) 275, 281; 23 L Ed 347 (1876).

It is also well established that the Commerce Clause generally operates to forbid two distinct types of discrimination. States may not discriminate between economic *entities* on the basis of in-state or out-of-state status, see, e.g., *Dean Milk Co v Madison,* 340 US 349; 71 S Ct 295; 95 L Ed 329 (1951) (discrimination against out-of-state milk producers); *Nippert v Richmond,* 327 US 416; 66 S Ct 586; 90 L Ed 760 (1946) (license tax on sales solicitation effectively discriminating against out-of-state distributors), nor may they discriminate between economic *goods, services, or activities* on the basis of in-state or out-of-state origin or location, see, e.g., *Wyoming v Oklahoma, supra* (discrimination against coal mined out of state); *New Energy Co of Indiana v Limbach,* 486 US 269; 108 S Ct 1803; 100 L Ed 2d 302 (1988) (discrimination against ethanol produced out of state); *Boston Stock Exchange v State Tax Comm,* 429 US 318; 97 S Ct 599; 50 L Ed 2d 514 (1977) (discriminatory tax on securities transfers resulting from out-of-state sales).

Either type of discrimination will run afoul of the Commerce Clause.[4] In *Nippert,* the Court in-

---

[4] I do not suggest that there is any bright-line division between

validated a municipal license tax on door-to-door salespeople because it had the effect of discriminatorily burdening out-of-state distributors as compared to established local businesses engaged in similar solicitation, see 327 US 429-432, even though the tax in no way hinged on whether the goods being sold were of in-state or out-of-state origin. Conversely, in *Boston Stock Exchange,* the Court struck down a discriminatory state tax on securities transfers resulting from out-of-state sales even though, in certain respects, it did not discriminate between in-state and out-of-state residents. The Court specifically rejected the argument that the tax was valid to the extent that it merely favored in-state sales by nonresidents over out-of-state sales by those same nonresidents.

> The fact that this discrimination is in favor of nonresident, in-state sales *which may also be considered as interstate commerce,* does not save [it] from the restrictions of the Commerce Clause. *A State may no more use discriminatory taxes to assure that nonresidents direct their commerce to businesses within the State than to assure that residents trade only in intrastate commerce.* [429 US 334-335. Citation omitted; emphasis added.]

### B. THE PURPORTED STATE INTEREST IN PROMOTING DOMESTIC DEVELOPMENT

The majority and Justice BRICKLEY rely very heavily on language in some opinions of the

these two broad types of discrimination. On the contrary, they ultimately amount to much the same thing. The ultimate concern of the Commerce Clause is with discrimination against interstate commerce as such—that is, with interstate economic protectionism. Interstate commerce cannot be carried out without interstate commercial entities, however—which will inevitably be "out-of-state" entities from the viewpoint of *some* state—and discriminatory burdens on the latter inevitably burden the former.

United States Supreme Court to the effect that the promotion of in-state investment and economic development is not, generally speaking, an impermissible state goal. See RILEY, J., *ante,* pp 424, 425-426; BRICKLEY, J., *post,* pp 480-481. My colleagues rely principally on passages in three United States Supreme Court opinions: *Boston Stock Exchange,* 429 US 336-337, *Armco, Inc v Hardesty,* 467 US 638, 645-646; 104 S Ct 2620; 81 L Ed 2d 540 (1984), and *Trinova,* 112 L Ed 2d 912. Because this issue appears to dominate my colleagues' analysis and conclusions, and because I believe my colleagues have misconstrued the United States Supreme Court's case law in this regard, I discuss this issue in some detail.

*Trinova* would seem, at face value, to afford the greatest support to my colleagues' position. The Court there stated:

> It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing state. States are free to "structur[e] their tax systems to encourage the growth and development of intrastate commerce and industry." [112 L Ed 2d 912, quoting *Boston Stock Exchange,* 429 US 336.]

Such sweeping language, if taken out of context and in isolation, would seem to flash a green light to economic protectionism. But this language can only properly be understood in context. In the first place, the Court in *Trinova,* in the passage containing the quoted language, was simply disposing of a claim that the three-factor SBT apportionment, although otherwise nondiscriminatory on its face and in its effect, had an unconstitutional discriminatory purpose as revealed in a speech by former Governor Blanchard, who stated "that the SBT was

enacted ' "to promote the development and investment of business within Michigan." ' " *Trinova,* 112 L Ed 2d 912. The Court was simply holding that such a broadly stated beneficial purpose, *without more,* did not establish unconstitutional discrimination.

It is inappropriate to read such generalized language endorsing a state's right to promote in-state economic development as a license to discriminate against interstate commerce, when the Court has otherwise emphatically and uniformly condemned such discrimination. There are many ways in which a state might promote domestic development without discriminating in any way against interstate commerce. To take the easiest example in the tax area, a state could simply reduce its uniform rate of taxation on all business activity conducted in, or fairly apportioned to, the state, with regard to all economic entities, both in state and out of state. Given the long and emphatic line of United States Supreme Court case law condemning state taxes that discriminate against interstate commerce, I think the only fair conclusion that can be drawn is that, however legitimate in general terms it may be for a state to promote domestic development, *it may not pursue that goal by means of taxes that discriminate against out-of-state economic entities or interstate economic activities. Boston Stock Exchange,* on which the above-quoted passage in *Trinova* relied, stated:

> Our decision today does not prevent the States from structuring their tax systems to encourage the growth and development of intrastate commerce and industry. Nor do we hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy. *We hold only that in the process of competition no State may discrimi-*

*natorily tax the products manufactured or the
business operations performed in any other State.*
[429 US 336-337. Emphasis added.]

In *Armco,* the Court addressed a West Virginia
gross receipts sales tax that exempted companies
engaged in manufacturing in West Virginia,
thereby disfavoring manufacturers based out of
state that wished to sell their products in West
Virginia. The asserted justification for the exemp-
tion was that West Virginia imposed a separate
and higher tax on manufacturing conducted in
West Virginia. West Virginia argued that, unless
an out-of-state company subject to the gross re-
ceipts tax could demonstrate that it was also sub-
ject to a manufacturing tax in the state or states
where it manufactured its goods, to the extent
that the overall tax burden on the out-of-state
company exceeded the overall burden on the in-
state company, no improper discrimination would
be established. See 467 US 639-644. The Court
rejected this argument and struck down the tax as
discriminatory on its face, stating:

> Any other rule would mean that the constitu-
> tionality of West Virginia's tax laws would depend
> on the shifting complexities of the tax codes of 49
> other States, and that the validity of the taxes
> imposed on each taxpayer would depend on the
> particular other States in which it operated. [*Id.* at
> 644-645.]

Most relevant to present purposes, the Court
continued:

> It is true, as the . . . amicus curiae points out,
> that Armco would be faced with the same situa-
> tion that it complains of here if Ohio (or some
> other State) imposed a tax only upon manufactur-

ing, while West Virginia imposed a tax only upon wholesaling. In that situation, Armco would bear two taxes, while West Virginia sellers would bear only one. But such a result would not arise from impermissible discrimination against interstate commerce but from fair encouragement of in-state business. [467 US 645.][5]

Thus, the Court indicated that a state may indeed fashion its tax laws to promote its domestic economy and "compete with other States for a share of interstate commerce," *Boston Stock Exchange,* 429 US 336-337, *but only in ways uniformly affecting a given type of economic activity, without any discriminatory treatment of out-of-state entities or activities.* In other words, according to *Armco,* West Virginia could repeal its manufacturing tax altogether in order to compete, but it could not grant domestic manufacturers a discriminatory exemption from its gross receipts tax.[6]

This conclusion has been repeatedly emphasized

[5] The Court then went on to quote, verbatim, the passage from *Boston Stock Exchange* that I have quoted above. *Id.* at 645-646.

[6] *Metropolitan Life Ins Co v Ward,* 470 US 869; 105 S Ct 1676; 84 L Ed 2d 751 (1985), although cited by Justice BRICKLEY in this regard, see *post,* pp 480-481, clearly supports my argument and conclusion. While *Ward* involved Equal Protection Clause rather than Commerce Clause analysis, the Court noted that both analyses involve a consideration of the legitimacy of the state's asserted interest. The only difference is that Equal Protection Clause analysis is less demanding in that the state law, if supported by a legitimate interest, is upheld if the law bears any rational relationship to that interest, whereas under Commerce Clause analysis the state interest, if legitimate, is weighed against the burden imposed on interstate commerce. See *Ward,* 470 US 881. In *Ward,* the Court struck down a state tax discriminating against out-of-state insurance companies and rejected the state's reliance on its asserted interest in promoting domestic business, holding:

[The] promotion of domestic business within a State, by discriminating against foreign corporations that wish to compete by doing business there, is not a legitimate state purpose. [*Id.* at 880.]

in other United States Supreme Court opinions. Quotations from two cases decided in the Court's most recent term should suffice to underscore my point. In *Chemical Waste Management, Inc v Hunt,* 504 US —; 112 S Ct 2009; 119 L Ed 2d 121 (1992), the Court, after reciting a number of its earlier decisions condemning discrimination under the Commerce Clause, stated:

> To this list may be added cases striking down a tax discriminating against interstate commerce, even where such tax was designed to encourage the use of ethanol and thereby reduce harmful exhaust emissions, *New Energy Co of* [*Indiana v Limbach, supra*], or to support inspection of foreign cement to ensure structural integrity. For in all of these cases, *"a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy."* [119 L Ed 2d 131-132. Some citations omitted; emphasis added.]

And in *Kraft General Foods, Inc v Iowa Dep't of Revenue & Finance,* 505 US —; 112 S Ct 2365; 120 L Ed 2d 59 (1992), the Court, in striking down yet another discriminatory state tax, declared:

> Absent a compelling justification, . . . *a State may not advance its legitimate goals by means that facially discriminate against foreign commerce.* [120 L Ed 2d 69. Emphasis added.][7]

### C. DIRECTLY APPLICABLE CASE LAW

The principle that a state may not impose a tax that discriminates against interstate commerce

---

[7] While *Kraft* involved a state tax found to discriminate against foreign commerce rather than interstate commerce, the relevant analysis, for present purposes, is identical.

has been reaffirmed repeatedly by a long line of United States Supreme Court decisions. See, e.g., *Amerada Hess Corp v New Jersey Dep't of the Treasury,* 490 US 66; 109 S Ct 1617; 104 L Ed 2d 58 (1989); *New Energy Co of Indiana v Limbach, supra; American Trucking Ass'ns, Inc v Scheiner,* 483 US 266; 107 S Ct 2829; 97 L Ed 2d 226 (1987); *Bacchus Imports, Ltd v Dias,* 468 US 263; 104 S Ct 3049; 82 L Ed 2d 200 (1984); *Armco, Inc v Hardesty, supra; Westinghouse Electric Corp v Tully,* 466 US 388; 104 S Ct 1856; 80 L Ed 2d 388 (1984); *Maryland v Louisiana,* 451 US 725; 101 S Ct 2114; 68 L Ed 2d 576 (1981); *Boston Stock Exchange v State Tax Comm, supra; Halliburton Oil Well Cementing Co v Reily,* 373 US 64; 83 S Ct 1201; 10 L Ed 2d 202 (1963); *Nippert v Richmond; Welton v Missouri, supra.*

The instant case, of course, like all the cases cited above, presents this familiar issue within its own unique factual context. The two cases most closely on point would appear to be *Westinghouse Electric Corp v Tully, supra,* and the very recent decision in *Kraft General Foods, Inc v Iowa Dep't of Revenue & Finance, supra.* Each of those cases, like the instant case, involved a state tax that discriminated through the operation of certain tax credits or deductions.

*Westinghouse* involved a challenge to a New York franchise income tax imposed on export companies.[8] A company's New York tax base is

---

[8] Specifically, the tax was imposed on corporate entities defined under the federal tax code as "Domestic International Sales Corporations" or "DISCS." "A corporation qualifies as a DISC if substantially all its assets and gross receipts are export-related." 466 US 390-391. As the Court explained, a DISC is not subject to federal income tax; rather, a portion of the DISC's income is attributed to the DISC's shareholders for federal tax purposes. Because of the different structure of New York's tax laws, however, New York either had to subject DISCS to its state franchise tax, or else not tax DISCS at all. See *id.* at 391-392. At the same time, New York was concerned "that state

generally apportioned according to a three-factor formula analogous to that upheld in *Trinova*.[9] The Court in *Westinghouse* noted that New York's apportionment formula (its "business allocation percentage") was not at issue in *Westinghouse,* and, indeed, had previously been upheld. See 466 US 398-399. At issue in *Westinghouse* was an amendment to the New York law providing for a tax credit "limited to gross receipts from export products 'shipped from a regular place of business of the taxpayer within [New York].'" *Id.* at 393. As the Court explained, "[t]he result of the credit is to lower the effective tax rate on the accumulated . . . income . . . to 30% of the otherwise applicable franchise tax rate." *Id.* Because the benefits of the tax credit increased or decreased in proportion to the percentage of the company's gross receipts derived from exporting goods *from New York,* as compared to the company's total gross receipts from exporting goods, the company argued, and the Court agreed, that the credit resulted in higher effective tax rates on New York-apportioned income for those companies exporting a smaller percentage of their products from New York, thereby discriminating against companies with a greater proportion of out-of-state business. See *id.* at 400-401, and n 9.

Most significantly for present purposes, the state argued in *Westinghouse* that limiting the tax credit to exports shipped from New York was

taxation of DISCS would discourage their formation in New York and also discourage the manufacture of export goods within the State." *Id.* at 392-393. In order to accommodate these conflicting concerns, New York imposed its franchise tax on DISCS, but attempted to offset the tax burden with the tax credit described in the text. See *id.* at 393-394.

[9] A company's New York-apportioned tax base is calculated on the basis of "the average of the percentages of the corporation's property situated, income earned, and payroll distributed within the State." 466 US 394, n 5.

justified as a way to ensure that the tax credit only applied to income that. was taxable by New York in the first place. This is similar to the argument primarily relied upon by the state in this case: that the apportionment of the CAD is a fair, if rough, way of ensuring that taxpayers like Caterpillar benefit from the CAD only to the extent that they actually do business in Michigan. The Court in *Westinghouse* rejected New York's argument because the calculation of the tax credit already took into account New York's business allocation percentage.

> In computing the allowable credit, the statute requires the [company] to factor in its business allocation percentage. . . . This procedure alleviates the State's fears that it will be overly generous with its tax credit, for once the adjustment of multiplying the allowable . . . export credit by the [company's] business allocation percentage has been accomplished, the tax credit has been fairly apportioned to apply only to the amount of the accumulated . . . income taxable to New York. From the standpoint of fair apportionment of the credit, the additional adjustment of the credit to reflect the . . . New York export ratio is both inaccurate and duplicative. [*Id.* at 399.]

In this case, of course, the apportionment formulas applied to the CAD are not "duplicative" of any other formulas. But Caterpillar contends that they are nevertheless *"inaccurate"* in the sense condemned by *Westinghouse.* Caterpillar contends that if the state's concern is to ensure that the benefits of the CAD are limited in proportion to the amount of business that a company does in Michigan, the state could satisfy that concern by simply applying the same three-factor apportionment formula to the CAD that is already applied to the

SBT.[10] Thus, as I discuss more fully in part II, to the extent the state's asserted justification for the CAD apportionment is to apportion the benefits of the CAD . to Michigan-related business, *Westinghouse* indicates that this asserted state interest simply does not justify the discriminatory nature and effect of the chosen formulas.

*Kraft* involved a challenge to Iowa's business income tax. While the challenge alleged only discrimination against *foreign* commerce rather than domestic interstate commerce, the relevant Commerce Clause analysis is fully applicable for present purposes. In defining the income subject to taxation, Iowa generally chooses, for purposes of convenience, to follow the definitions of federal tax law. One of the results of applying the federal definitions to Iowa's tax structure was that Iowa allowed a parent company doing business in Iowa to deduct from its Iowa-apportioned tax base dividends received from subsidiaries incorporated in the United States, but not dividends received from subsidiaries incorporated in foreign countries, unless the dividends reflected business activity in the United States. See *Kraft*, 120 L Ed 2d 65-66.

Because the inevitable effect of Iowa's deduction scheme was to increase the effective rate of taxation on a company's Iowa-apportioned income when it received dividends from foreign subsidiaries reflecting foreign business activity, as compared to when it received dividends from domestic subsidiaries,[11] the Court concluded that the Iowa

[10] In fact, the Legislature has already responded to the lower court decisions in this case by amending the CAD provision so that the CAD is apportioned in precisely this manner, beginning with tax years after September 30, 1989. See 1991 PA 77, .MCL 208.23(c); MSA 7.558(23)(c), and 1991 PA 128, MCL 208.23(c), (d); MSA 7.558(23)(c), (d).

[11] Obviously, the ultimate effective tax rate on a given tax base is relatively lower whenever a deduction from that tax base is allowed, and relatively higher whenever a deduction is not allowed.

tax "facially discriminates against foreign commerce and therefore violates the Foreign Commerce Clause." 120 L Ed 2d 69.[12]

Taken together, *Westinghouse* and *Kraft* indicate that a state tax discriminates in violation of the Commerce Clause if, as a result of the operation of credits or deductions, the effective tax rate imposed on the income or other tax base apportioned to a state varies on the basis of the out-of-state (or foreign) status of the taxpayer or related business entity, or on the basis of the degree of activity in interstate (or foreign) commerce, so as to favor in-state (or domestic) commerce and disfavor out-of-state (or foreign) commerce. As I hope to demonstrate in part II and in the appendix, these are precisely the discriminatory effects of the CAD apportionment at issue in this case.

## II. APPLICATION OF THE ANALYSIS TO THIS CASE

The majority in this case correctly cites *Complete Auto Transit, Inc v Brady,* 430 US 274; 97 S Ct 1076; 51 L Ed 2d 326 (1977), for the general framework of analysis applied to a challenge to a state tax under the Commerce Clause. As the United States Supreme Court recently reaffirmed, a court

> will sustain a tax against a Commerce Clause challenge so long as the "tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly

[12] *Kraft* illustrates how discrimination on the basis of the out-of-state (or foreign) *status* of a business entity is tied inextricably to discrimination against interstate (or foreign) commerce as such. As the Court noted: "The flow of value between Kraft and its foreign subsidiaries clearly constitutes foreign commerce; this flow includes the foreign subsidiary dividends, which, as Iowa acknowledges, themselves constitute foreign commerce." 120 L Ed 2d 66.

related to the services provided by the State."
[*Quill Corp v North Dakota,* 504 US —; 112 S Ct
1904; 119 L Ed 2d 91, 105 (1992), quoting *Complete
Auto,* 430 US 279.]

Caterpillar does not contend before this Court,
however, that the SBT, as modified by the CAD,
taxes any activity lacking a "substantial nexus"
with Michigan, nor does it contend that the tax is
not "fairly related to the services provided by"
Michigan. Caterpillar also does not challenge the
apportionment formulas applied to the personal
property and real property components of the CAD
on the ground that either of those formulas, taken
alone, would not constitute a fair method of appor-
tioning Caterpillar's business activity attributable
to Michigan.[13] Thus, the first, second, and fourth
prongs of the *Complete Auto* analysis are not at
issue in this case.[14]

---

[13] That is, Caterpillar does not appear to contend that it would be
impermissible for Michigan to apportion both the SBT and the CAD on
the basis of whether the relevant economic activity physically takes
place in Michigan, consistent with the strict geographical apportion-
ment of the real property CAD. Nor does Caterpillar appear to contend
that it would be impermissible to apportion both the SBT and the CAD
on the basis of a two-factor formula including only the property and
payroll factors, consistent with the apportionment of the personal
property CAD. Rather, the essence of Caterpillar's argument is that
Michigan, having chosen to apportion the SBT itself on the basis of the
three-factor formula (including the sales factor), cannot apportion the
CAD on the basis of different and inconsistent formulas, where the
result is discrimination against interstate commerce.

[14] The discussion of issues regarding "fair apportionment," "taxing
extraterritorial values," "substantial nexus," and "fair relation to
services provided," by both the majority and Justice Brickley, see
Riley, J., *ante,* pp 416-422, 427-429; Brickley, J., *post,* pp 471, 479-480,
483-484, is therefore beside the point and only confuses the precise
issue properly before us. Whether the CAD is "fairly apportioned" is a
separate question from whether the CAD apportionment, considered in
light of the underlying SBT apportionment, facially and inevitably
discriminates against interstate commerce in the manner alleged by
Caterpillar. See, e.g., *Amerada Hess,* 490 US 75 ("[e]ven if a tax is
fairly apportioned, it may discriminate against interstate commerce");
*Westinghouse,* 466 US 399 (" '[f]airly apportioned' and 'nondiscrimina-
tory' are not synonymous terms").

Caterpillar's only contention before this Court is that the CAD apportionment formulas, in conjunction with the underlying three-factor apportionment of the SBT itself, improperly discriminate against interstate commerce, and specifically against Caterpillar itself as a predominantly out-of-state commercial entity engaged in interstate commerce.[15] This issue is governed by the principles and case law set forth in part I.

Under the personal property CAD, the taxpayer is, generally speaking, allowed to deduct from its Michigan-apportioned tax base the costs of depreciable personal property accrued during the tax year. The personal property CAD for a given year is apportioned to Michigan according to the average of the taxpayer's property and payroll factors.[16] Leaving aside the effect of apportionment, the personal property CAD is available without regard to whether the personal property is acquired or placed into service in state or out of state. Because the property factor is based on all real and personal property owned or rented during the tax year,[17] however, it will necessarily be affected—and the apportionment formula resulting from the

Furthermore, while it is true that a prohibition of extraterritorial taxation is part of the broad reach of the Commerce Clause, as well as the Due Process Clause, see, e.g., *Trinova,* 112 L Ed 2d 913 (Scalia, J., concurring in the judgment), no plausible claim of extraterritorial taxation is or could be presented by this case. The SBT itself was upheld against precisely such a claim in *Trinova.* This case involves only the apportionment of certain deductions from the SBT. Obviously, if a tax itself is not improperly extraterritorial in reach, related tax *deductions* cannot render it so. They can, however, as a result of the apportionment formulas used, cause it to discriminate against interstate commerce.

[15] Of course, Caterpillar also contends that any decision striking down the CAD apportionment should apply retroactively and that it should be entitled to an appropriate remedy. But I am addressing here only the central constitutional issue.

[16] See MCL 208.23(a); MSA 7.558(23)(a), as enacted before 1991 PA 77.

[17] See MCL 208.46; MSA 7.558(46).

average of the property and payroll factors will thus also be affected—by whether newly acquired personal property subject to the CAD is placed into service in state or out of state.

Thus, it is clear, on the face of the statute, that two otherwise similarly situated companies that invest in equal-value amounts of new personal property during the tax year will receive different deductions under the CAD, depending on the degree to which they are physically based in Michigan to begin with (as measured by the property and payroll factors), *and* depending on whether they invest the newly acquired personal property in state or out of state. Furthermore, it is clear that a greater deduction, resulting in a lower effective tax rate on the Michigan-apportioned tax base, is afforded both to (1) a company that is more predominantly based in Michigan to begin with, as compared to a company more predominantly based out of state, and (2) a company investing the new personal property in state, as compared to a company investing the new personal property out of state. These discriminatory effects are illustrated by the hypothetical numerical examples set forth in the appendix, tables I(A) and II(A).[18]

The first effect needs little explanation. Because the apportionment of the personal property CAD is directly tied to the average proportion of property and payroll situated in Michigan, it is obvious that a predominantly Michigan-based company will reap a far greater benefit from any investment in personal property (whether in state or out of state) than will a predominantly non-Michigan-based company (with the same Michigan-apportioned tax

[18] My reliance on hypothetical examples like those set forth in the appendix is supported by *Westinghouse,* where the Court relied on similar hypothetical examples to illustrate the inevitably discriminatory character and effect of a state tax. See 466 US 400, n 9 (tables A, B, and C).

base) making an identical investment.[19] The second effect is more subtle and indirect, but no less inevitable. Because an in-state investment in personal property will always increase (however slightly) the property factor and thus the personal property CAD apportionment formula, while an out-of-state investment will always decrease both numbers, a company investing in personal property in state will always end up reaping a greater personal property CAD than will a similarly situated company making an equivalent investment out of state.[20]

---

[19] Of course, even if the personal property CAD were apportioned according to the three-factor SBT formula, a more predominantly "Michigan-based company" *as measured by the three-factor formula* would likewise gain a greater deduction from a given investment in personal property than would a more predominantly "non-Michigan-based company" *as measured by the three-factor formula.* But in that case, by definition, the amount of the deduction would vary in precise proportion to the amount of the tax base apportioned to Michigan, thus resulting in identical effective tax rates following any given deduction, regardless of the in- or out-of-state character of the company as measured by any factors.

The problem with the personal property CAD apportionment, and the source of the primary discriminatory effect identified in the text, is the fact that the apportionment of the deduction is divorced from the apportionment of the tax base and structured so as to focus exclusively on the location of the company's physical base as measured by the property and payroll factors. The problem is not simply that different companies are allowed to deduct different amounts, but that the difference persists *even when the tax base apportioned to Michigan is held constant,* thus resulting in a discriminatory difference in effective tax rates *hinging solely on the location of the company's physical base.* See appendix, tables I(A) and II(A) (hypotheticals holding constant the Michigan-apportioned tax base while varying the physical base of the company as measured by the property and payroll factors).

[20] Of course, even if the personal property CAD were apportioned according to the three-factor SBT formula, investing in personal property in state would (to a lesser degree) increase the apportioned deduction, just as investing out of state would (to a lesser degree) reduce it. But in that case, both the deduction and the Michigan-apportioned tax base would increase or decrease in equal proportion, resulting in identical effective tax rates following either an in- or out-of-state investment. The problem with the personal property CAD apportionment in this regard, and the source of this second discriminatory effect, is that it causes the deduction, following any given

Under the real property CAD, the taxpayer is, generally speaking, allowed to deduct from its Michigan-apportioned tax base the costs of depreciable real property accrued during the tax year. The real property CAD, however, is limited to property "physically located in Michigan."[21] The "apportionment" of the real property CAD to Michigan is thus strictly dependent on the in- or out-of-state location of the property in which the taxpayer invests, and does not depend on the relative in- or out-of-state status of the taxpayer.[22]

It is clear, on the face of the statute, that two otherwise similarly situated companies that invest in real property of equal value during the tax year will receive either a substantial deduction or no deduction at all, depending on whether that property is located in state or out of state. Furthermore, the deduction, resulting in a substantially lower effective tax rate on the Michigan-apportioned tax base, is afforded only to a company investing in Michigan real property, as compared to a similarly situated company investing in out-of-state real property. This discriminatory effect is illustrated by the hypothetical numerical examples set forth in the appendix, tables I(B) and II(B).[23]

Thus, both the personal property and real prop-

_____

investment, to increase or decrease in a proportion greater than the increase or decrease in the Michigan-apportioned tax base, thus causing the final effective tax rate to vary depending on whether the investment is made in state or out of state.

[21] MCL 208.23(c); MSA 7.558(23)(c) as enacted before 1991 PA 77.

[22] But see n 23.

[23] Furthermore, the hypothetical examples reveal a second discriminatory effect, analogous to the first discriminatory effect identified with regard to the personal property CAD, that is not initially obvious. It appears that a predominantly Michigan-based company will gain a slightly greater benefit from a given investment in Michigan real property, in terms of effective tax rate, than will a predominantly non-Michigan-based company (with the same Michigan-apportioned tax base) making an identical investment in Michigan real property. See appendix, tables I(B) and II(B), and n 34.

erty CAD apportionment formulas, when applied in conjunction with the three-factor apportionment of the SBT itself, result in the imposition of higher effective tax rates on the Michigan-apportioned tax base with regard to companies that are either predominantly non-Michigan based or that direct their investments outside Michigan, as compared to companies that are predominantly Michigan based or that direct their investments inside Michigan. These discriminatory effects converge so as to afford an especially preferential tax rate to a Michigan-based company that invests in Michigan, as compared to a non-Michigan-based company that invests outside Michigan.

These facial and inevitable discriminatory effects contravene the Commerce Clause as interpreted by the United States Supreme Court, most notably in *Westinghouse* and *Kraft.* See part I(C).[24] That the disputed tax, as in this case, is a general tax on income, value-added, or other business activity, rather than a transactional tax directly targeting interstate activities or out-of-state products, is

> irrelevant to our analysis. The franchise tax [at issue in *Westinghouse*] is a tax on the income of a business from its aggregated business transactions. It cannot be that a State can circumvent the

[24] The United States Supreme Court has held that "a tax may violate the Commerce Clause if it is facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce." *Amerada Hess,* 490 US 75. Because the tax at issue is discriminatory both on its face and in its inevitable effect, I need not consider whether it was enacted with an illicit discriminatory purpose. But see n 29. Nor do I need to consider whether it has any indirect discriminatory effect implicating the "deeper meaning" of the Commerce Clause "embodied in the requirement of fair apportionment." *Trinova,* 112 L Ed 2d 912; cf. BRICKLEY, J., *post,* p 483. As I have already noted, I do not believe Caterpillar even alleges any impropriety in the CAD apportionment related to the "fair apportionment" prong of Commerce Clause analysis, and I therefore believe that any discussion of that issue is extraneous and serves only to distract us from the issue properly presented. See n 14.

> prohibition of the Commerce Clause against plac-
> ing burdensome taxes on out-of-state transactions
> by burdening those transactions with a tax that is
> levied in the aggregate—as is the franchise tax—
> rather than on individual transactions. [*Westing-
> house,* 466 US 404.]

Nor is it relevant that a discriminatory effective tax rate results indirectly from the operation of tax credits or deductions, rather than being directly imposed. "We have declined to attach any constitutional significance to such formal distinctions that lack economic substance." *Id.* at 405; see also *Kraft, supra.* Finally, the magnitude of the discriminatory effect is irrelevant; any measurable discriminatory effect, however small, is unconstitutional. See *Wyoming v Oklahoma,* 117 L Ed 2d 23; *Westinghouse,* 466 US 407 ("the Court 'need not know how unequal the Tax is before concluding that it unconstitutionally discriminates' ").[25]

"When a state statute clearly discriminates against interstate commerce, it will be struck down, unless the discrimination is demonstrably justified by a valid factor *unrelated to economic protectionism.*" *Wyoming v Oklahoma,* 117 L Ed 2d 22 (citations omitted; emphasis added). As the Court stated even more recently in the context of discrimination against foreign commerce: "Absent a *compelling* justification, . . . a State may not advance its legitimate goals by means that facially discriminate . . . ." *Kraft,* 120 L Ed 2d 69 (emphasis added). The Court struck down the discrimina-

---

[25] Furthermore, I agree with Justice Brickley that when a tax is shown to be facially discriminatory by abstract analysis, the United States Supreme Court has never required further empirical evidence of discriminatory effect, nor has it permitted a showing of facial discrimination to be overcome by empirical evidence purporting to demonstrate that the overall practical effect of the tax, taking into account other variable factors, is not discriminatory. See *post,* p 470, n 3.

tory tax in *Kraft* because "this is not a case in which the State's goals 'cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id.*

The primary state interest asserted in support of the chosen apportionment formulas for both the personal property and real property CAD is the need to apportion the CAD to Michigan, consistent with the apportionment of a company's overall tax base to Michigan for purposes of the SBT. While this goal is certainly legitimate (and even, it may be assumed, compelling), it completely fails to justify the discriminatory nature and effect of the apportionment formulas the state has chosen to achieve that goal. All of the demonstrated discriminatory effects could easily have been avoided by simply apportioning both components of the CAD by the same three-factor formula used to apportion the SBT itself. The state has not argued, and could not reasonably argue, that applying the SBT three-factor apportionment to the CAD would fail to achieve its asserted goal in this regard. Indeed, the state has already amended the CAD statute in response to the lower court decisions in this case to provide for precisely such an apportionment of the CAD for tax years beginning after September 30, 1989.[26]

---

[26] See n 10 and accompanying text. The majority's contention that "[f]ormulas used in apportioning a value-added tax base and a deduction provided for acquisitions of capital are not constitutionally required to be identical," *ante,* p 423, while possibly true, is beside the point. I am not sure whether it would be possible to devise an apportionment formula for the CAD different from that applied to the SBT, that would avoid the discrimination created by the combination currently before us. The state, however, is perfectly free to attempt to do so. My conclusion in this case does not rest on any abstract requirement that the apportionment formulas be "symmetrical." Cf. RILEY, J., *ante,* p 423. Regardless of whether the formulas used are symmetrical or different, they may not operate, as they do in this case, to discriminate against interstate commerce.

Furthermore, any argument that the two-factor personal property

The state asserts an additional goal limited to the real property CAD apportionment: the encouragement of investment in Michigan real property. This goal, however, is clearly not "unrelated to economic protectionism." On the contrary, the goal of encouraging both in- and out-of-state companies to direct their investments in real property toward Michigan as opposed to outside Michigan bears a strong and obvious relationship to economic protectionism.

I agree with Justice BRICKLEY, of course, that this asserted goal is not, generally speaking, a categorically impermissible purpose. Cf. BRICKLEY, J., *post,* p 480. As I have discussed in part I(B), it is perfectly permissible for a state to promote in-state investment and economic development, *but only as long as the state does not attempt to do so by means of discriminating against interstate commerce.* It would turn logic and more than a century of United States Supreme Court precedent upside down to imply, as my Brother BRICKLEY comes close to doing, that a state *may* discriminate against interstate commerce whenever doing so serves (as it inevitably would) the goal of promoting in-state investment and economic development. That goal, while not categorically invalid, is simply not, by any stretch of the imagination, sufficiently "unrelated to economic protectionism" to justify a state tax that discriminates against interstate commerce.[27]

CAD apportionment might be justified as a way to relieve taxpayers of "burdensome accounting problems," RILEY, J., *ante,* p 411, is obviously unfounded. The three-factor apportionment formula is equally convenient for taxpayers to use.

[27] A useful analogy arises from First Amendment doctrine as applied in the famous flag-burning case. See *Texas v Johnson,* 491 US 397; 109 S Ct 2533; 105 L Ed 2d 342 (1989). The state there had asserted, as an interest in support of its prohibition of flag burning, the goal of "preserving the flag as a symbol of nationhood and national unity." *Id.* at 410. The Court had little difficulty concluding

It is important to keep in mind that the issue in this case is not the validity of the state's *goal,* but rather the validity of the CAD apportionment at issue. Just as generalized assertions of "interstate economic protectionism" do not suffice to demonstrate the *invalidity* of the CAD apportionment, generalized endorsements of the goal of "providing incentives for the growth of intrastate industry," *post,* p 480, upon which my Brother BRICKLEY relies so heavily, go no further to support its *validity.*

In conclusion, it is useful to step back and consider the discriminatory effect of the CAD apportionment in broad, practical terms. A company like Caterpillar that is physically based primarily out of state, but that has a more significant proportion of *sales* in Michigan, is taxed to some extent under Michigan's SBT on the value added to its products in its non-Michigan plants, on the basis of its Michigan sales as incorporated into the three-factor formula. While such taxation might, at first glance, seem to be improperly "extraterritorial," the United States Supreme Court upheld the SBT in *Trinova* on the theory that the "true" geographical origin of value-added, like that of business income, cannot be determined with any meaningful precision. See 112 L Ed 2d 904-911.

Rather, the Court held that Michigan could reasonably assume that the Michigan-related sales activities of a company physically based primarily outside Michigan add significantly to the value of

that this asserted goal was not "[un]related 'to the suppression of free expression' within the meaning of [*United States v O'Brien,* 391 US 367, 377; 88 S Ct 1673; 20 L Ed 2d 672 (1968)]," 491 US 410, and therefore could not support the disputed restriction on expressive conduct, even though that goal, like the asserted goal in this case, was clearly not inherently impermissible, and could validly be pursued in any number of ways. See *id.* at 418 ("we do not doubt that the government has a legitimate interest in making efforts to 'preserv[e] the national flag as an unalloyed symbol of our country' ").

the products sold. See 112 L Ed 2d 905-906. Thus, while it is impossible. to identify precisely *how much* value is added by sales activities, see 112 L Ed 2d 905-908, the sbt may properly be apportioned in part on the basis of where sales occur. The theory is that it would be artificial and unrealistic to geographically assign a company's value-added solely on the basis of where the company's productive activities *physically* take place, as measured by the location of property and payroll. See 112 L Ed 2d 910 ("[we] reject the complete exclusion of sales as somehow resulting in more accurate apportionment").

The problem is that Michigan, having chosen to tax with one hand a non-Michigan-based company's productive activities conducted at out-of-state factories with out-of-state employees and equipment, on the basis of Michigan sales as calculated under the three-part formula, then turns around and refuses, with the other hand, to allow the company a deduction for acquisitions of property that would also reflect, to an equivalent degree, the company's Michigan sales. On the contrary, Michigan limits the availability of the personal property cad strictly according to the degree to which the company's overall property and payroll are physically located in Michigan. And Michigan limits the availability of the real property cad according to whether the property obtained is physically located in Michigan. Thus, a company that purchases or builds a factory outside Michigan, and hires employees and places equipment into service in that factory to engage in production, will be taxed by Michigan on the productive activities that take place in that factory, to the extent, as reflected in the three-factor formula, that the products manufactured are sold in Michi-

gan.[28] And yet the company will not receive any deduction for its acquisition of the factory, and will receive a deduction for its acquisition of the equipment only to the extent (small or non-existent, by hypothesis) that the company's overall property and payroll are based in Michigan.[29]

By relying in part on Michigan sales for initial *taxation* purposes, while relying exclusively on Michigan property and payroll for relevant *deduc-*

---

[28] I disagree with Justice BRICKLEY's assertion that "Michigan does not tax any of those [physically out-of-state] activities." *Post,* p 483, n 13. A company is subject to taxation under Michigan's SBT, even if it has virtually no property, payroll, or production within Michigan, as long as it has some Michigan sales. Of course, sales themselves are deemed by *Trinova* to be a form of "productive activity" that adds some value to the products sold. See 112 L Ed 2d 905-906. But *Trinova* clearly rejected any requirement that *the precise amount of value actually added* by in-state sales be calculated for taxation purposes. Rather, as discussed in the text above, *Trinova* concluded that value-added is not "subject to geographic ascertainment," 112 L Ed 2d 911, and, therefore, that *all* of a company's value-added, *including that which may be assignable to out-of-state production,* may properly be apportioned to a state on the basis of the three-factor formula, relying in part on the proportion of in-state sales. See 112 L Ed 2d 908 ("we [have] rejected outright the idea that geographically assignable costs of production must be excluded from an apportionment of income").

[29] Thus, it is apparent that the chosen apportionment formulas for the CAD not only discriminate against interstate commerce, but also violate the basic economic logic of apportioning a value-added tax according to a three-factor formula including sales. Of course, economic illogic is not itself a ground for finding that a tax violates the Commerce Clause. But it indirectly supports my conclusion by suggesting that the Legislature's enactment of the CAD apportionment could only have been motivated by economic protectionism. See, e.g., Haughey, *The economic logic of the single business tax,* 22 Wayne L R 1017, 1027 (1976) (emphasis added):

> The deduction for capital acquisitions necessary to compute net capital costs and avoid double taxation is an approximation *purposefully designed·to favor investments located in Michigan.* This was made necessary by the decision to use the standard, but arbitrary, property-payroll-sales apportionment factor for multistate businesses. *The desire to stimulate the state economy was also a factor.*

Significantly, the author was, at the time, the Assistant Director of the Office of Revenue and Tax Analysis in the Michigan Department of Management and Budget. *Id.* at 1017, n †.

*tion* purposes, the combined apportionment scheme of the SBT and the CAD results in classic economic protectionism. Predominantly non-Michigan-based companies that import heavily into Michigan have the worst of both worlds: relatively higher tax bases due to their higher proportion of sales in Michigan, and relatively lower (or nonexistent) deductions pursuant to the CAD. In stark contrast, predominantly Michigan-based companies that export heavily to other states have the best of both worlds: relatively lower tax bases due to their lower proportion of sales in Michigan, and much higher deductions pursuant to the CAD. At risk of beating a dead horse, let me quote once again from *Wyoming v Oklahoma,* 117 L Ed 2d 22: "[W]hen the state statute amounts to simple economic protectionism, a 'virtually per se rule of invalidity' has applied."

### III. THE ANALYSIS OF JUSTICE BRICKLEY AND THE MAJORITY

I agree with my Brother BRICKLEY's conclusion that the personal property CAD apportionment is invalid under the Commerce Clause. With regard to the real property CAD apportionment, however, I believe, with all due respect, that Justice BRICKLEY and the majority misconstrue the governing case law of the United States Supreme Court. Justice BRICKLEY suggests that the real property CAD is valid simply because it "is provided wholly independent of a company's interstate character." *Post,* p 471. The majority, likewise, relies on a law review article published in 1976 that asserts:

"The [SBT] does not contain provisions aimed at imposing adverse tax consequences upon multistate taxpayers as a class. Generally speaking, the overall tax consequences to a multistate taxpayer

will be dependent upon the nature of its business
activities . . . ." [*Ante*, p 425, quoting Pollock,
*Multistate taxpayers under the Single Business
Tax Act*, 22 Wayne L R 1101, 1113 (1976).]

In fact, as I have attempted to demonstrate in
part II, the CAD apportionment *does* "impos[e] ad-
verse tax consequences upon multistate taxpayers
as a class," as compared to taxpayers primarily or
exclusively based in Michigan. More fundamen-
tally, however, it is not *necessary* to demonstrate
that a tax discriminates against interstate or
multistate taxpayers as a group in order for it to
violate the Commerce Clause. As I have discussed,
even holding constant the in- or out-of-state char-
acter of the company, the CAD apportionment dis-
criminates against interstate economic *activities.*
This alone would be sufficient to invalidate the
scheme. The author of the quoted law review
article did not have the benefit of *Boston Stock
Exchange, supra,* decided the following year, in
which the Court clarified that even when both the
favored and disfavored business activities involve
out-of-state entities and interstate commerce, the
Commerce Clause is violated by discrimination
designed to "direct [such] commerce to businesses
within the State . . . ." 429 US 334-335, quoted
more fully in part I(A).

In view of that unequivocal language in *Boston
Stock Exchange,* I disagree with Justice BRICKLEY's
assertion that "it is entirely permissible to grant a
credit using in-state activity as a criterion." *Post,*
p 480. In fact, relying on the in-state status of an
economic transaction or activity was precisely
what the Court struck down as invalid in both
*Boston Stock Exchange* and *Westinghouse, supra.*
My colleague relies heavily on the analogies be-
tween *Westinghouse* and this case with regard to

the personal property CAD, but seems to overlook
the even more obvious analogies with regard to
the real property CAD. While the parallels with
*Westinghouse* should not be overdrawn, as that
case involved a tax *credit* operating differently
from the tax *deduction* at issue here, *Westing-
house* squarely rejected New York's decision to tie
the benefits of its tax credit to the geographical
location (inside New York) from which the tax-
payer exported goods. Similarly, Michigan has
chosen to tie the benefits of its real property CAD
to the geographical location (inside Michigan) of
the real property potentially subject to the deduc-
tion.

I think it is incorrect, in light of *Boston Stock
Exchange* and *Westinghouse,* to suggest that facial
discrimination under the Commerce Clause results
only

> when a statute creates two categories of jurisdic-
> tional activity, one that is composed of intrastate
> activity and one that is composed of interstate
> activity, and imposes a burden on the interstate ac-
> tivity not shared by intrastate taxpayers. [Brickley,
> J., *post,* p 478.]

In both *Boston Stock Exchange* and *Westinghouse,*
both the favored and disfavored activities could be
characterized as "interstate commerce," and both
the favored and disfavored entities could be char-
acterized as "interstate taxpayers." And yet the
Court struck down the taxes at issue because they
discriminated in favor of activities directed toward
the taxing state. Such discrimination, after all, is
the very essence of "interstate economic protec-
tionism."

Justice Brickley states that "the CAD for real
property treats all acquisitions of real property in
Michigan without regard to a company's interstate

activity . . . ." *Post,* p 478. But the very acquisi-
tion of property outside Michigan, as opposed to
inside Michigan, constitutes a type of "interstate
activity" protected against discrimination by the
Commerce Clause. Obviously, the real property
CAD does have "regard" to—indeed, it relies exclu-
sively upon—whether the property acquired is
inside Michigan or outside Michigan. Relying ex-
clusively on that in-state geographical criterion is
no more valid in this case than was New York's
reliance on the in-state location from which ex-
ports were shipped in *Westinghouse,* or New
York's reliance on the in-state location of securi-
ties sales in *Boston Stock Exchange.*[30]

Finally, I must take issue with Justice BRICKLEY's
assertion that my analysis with regard to the
real property CAD "hinges on a faulty comparison
of in-state, jurisdictional activity and out-of-state,
nonjurisdictional activity," and that "[f]or the pur-
poses of the Commerce Clause, these activities are
noncomparable." *Post,* p 481. As I believe my
analysis makes perfectly clear, the unlawful dis-

[30] While it is obviously true that "any credit necessarily creates a
difference between those who qualify for it and those who do not
qualify for it," BRICKLEY, J., *post,* p 481, it is untenable to suggest that
the kinds of discriminatory differences in treatment that exist in this
case—and that render the CAD apportionment invalid under the
Commerce Clause—would necessarily exist with regard to *any* tax
credit or deduction. The Court's statement in *Westinghouse* that "it is
not the provision of the credit that offends the Commerce Clause,"
466 US 406, n 12, is precisely analogous to the proposition, undis-
puted in this case, that there is nothing wrong with the CAD itself
under the Commerce Clause. The only problem is that the CAD,
analogously to the tax credit in *Westinghouse,* is apportioned "on an
impermissible basis." *Id.* Just as New York could not justify as a
neutral "subsidy to export commerce" a tax credit that actually
discriminated against exports shipped from outside New York, see *id.,*
so Michigan cannot justify as a neutral investment incentive a tax
deduction apportioned so as to discriminate against companies choos-
ing not to direct their investments toward Michigan, and against
companies based more predominantly outside Michigan, by imposing
a higher effective tax rate on such companies' Michigan-apportioned
value-added.

crimination that I discern in this case consists of the different and discriminatory effective tax rates imposed on a company's SBT tax base *concededly within Michigan's jurisdiction.* The effective tax rate hinges in part on a company's choice to direct its commerce toward Michigan or away from Michigan. Whether Michigan would have "jurisdiction" for tax purposes over the commerce directed away from Michigan is irrelevant; this case does not involve a transaction tax aimed directly at the disfavored commerce. Rather, as the governing case law indicates, Michigan may not discriminate against such commerce by varying the effective rate of tax imposed on that portion of the company's value-added that is *concededly within Michigan's jurisdiction.*

My difficulties with the majority's analysis run even deeper. The majority does not come to grips with the facial discriminatory effect of the CAD apportionment. As my Brother BRICKLEY points out, the mere fact that "[t]he CAD is *available* for any taxpayer," RILEY, J., *ante,* p 422 (emphasis added), wholly fails to alleviate the infirmity of the CAD apportionment formulas, which render the CAD "available" only on terms that facially discriminate against interstate commerce. See BRICKLEY, J., *post,* pp 476-477.

The majority correctly states that

[t]he United States Supreme Court has held that when the different effects of a tax provision on different companies result solely from the differences between the nature of these companies' businesses and not from the location of their activities (i.e., in state or out of state), there exists no discriminatory effect on interstate commerce. [*Ante,* p 425.]

But as I have attempted to demonstrate in part II, the "different effects" of the tax scheme at issue *do* result "from the location of [the companies'] activities," and not just from the different nature of the taxed business activities. Indeed, I have postulated, in my analysis and in the hypothetical examples in the appendix, similarly situated companies engaged in identical types of business activity, with the only differences being the in- or out-of-state character of the companies or their activities.

## IV. THE RETROACTIVITY ISSUE AND THE REMEDY ISSUE

In view of my dissenting posture, I will not attempt to reach a definitive conclusion with regard to the retroactivity or remedy issues. I would note only the general principle set forth in *McKesson Corp v Florida Dep't of Business Regulation,* 496 US 18, 43, n 27; 110 S Ct 2238; 110 L Ed 2d 17 (1990):

> In order to cure the illegality of [a] tax as originally imposed, the State must ultimately collect a tax for the contested tax period that in no respect impermissibly discriminates against interstate commerce.

## V. CONCLUSION

For the reasons I have stated, I respectfully dissent.

LEVIN, J., concurred with CAVANAGH, C.J.

Dissenting Opinion by Cavanagh, C.J.

APPENDIX

I.   A HYPOTHETICAL, PREDOMINANTLY NON-MICHIGAN-BASED IMPORT COMPANY

A.   EFFECT OF PERSONAL PROPERTY INVESTMENTS

|  | At the outset | Following $100,000 personal property investment, | |
|---|---|---|---|
|  |  | in state | out of state |
| Total SBT Tax Base | $1,000,000 | $1,000,000 | $1,000,000 |
| Total Real Property | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 300,000 | 300,000 | 300,000 |
| Outside Michigan | 700,000 | 700,000 | 700,000 |
| Total Personal Property | $1,000,000 | $1,100,000 | $1,100,000 |
| In Michigan | 300,000 | 400,000 | 300,000 |
| Outside Michigan | 700,000 | 700,000 | 800,000 |
| Total Payroll | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 300,000 | 300,000 | 300,000 |
| Outside Michigan | 700,000 | 700,000 | 700,000 |
| Sales Percentage: |  |  |  |
| In Michigan | 90% | 90% | 90% |
| Outside Michigan | 10% | 10% | 10% |
| SBT Property Factor | 0.3 | 0.3333 | 0.2857 |
| SBT Payroll Factor | 0.3 | 0.3 | 0.3 |
| SBT Sales Factor | 0.9 | 0.9 | 0.9 |
| 3-Factor Apportionment | 0.5 | 0.5111 | 0.4952 |
| Apportioned Tax Base | $500,000 | $511,111 | $495,238 |
| Apportioned CAD: |  |  |  |
| Real Property | $0 | $0 | $0 |
| Personal Property | $0 | $31,667 | $29,286 |
| Adjusted Tax Base | $500,000 | $479,444 | $465,952 |
| Tax (at 2.35% rate) | $11,750 | $11,267 | $10,950 |
| Effective Tax Rate[31] | 2.3500% | 2.2044% | 2.2111% |
| Discriminatory advantage of in-state investment:[32] | 0.0067% or $34 | | |

---

[31] I.e., amount of tax divided by apportioned tax base.

[32] This comparison, as used in this table and the following tables, compares the effective tax rates in columns two and three; the dollar figure equals the difference between the amount of tax paid in column two and the amount that would have been paid if the tax rate in column three applied to the apportioned tax base in column two.

B.  EFFECT OF REAL PROPERTY INVESTMENTS

|  | At the outset | Following $100,000 real property investment, | |
|---|---|---|---|
|  |  | in state | out of state |
| Total sbt Tax Base | $1,000,000 | $1,000,000 | $1,000,000 |
| Total Real Property | $1,000,000 | $1,100,000 | $1,100,000 |
| In Michigan | 300,000 | 400,000 | 300,000 |
| Outside Michigan | 700,000 | 700,000 | 800,000 |
| Total Personal Property | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 300,000 | 300,000 | 300,000 |
| Outside Michigan | 700,000 | 700,000 | 700,000 |
| Total Payroll | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 300,000 | 300,000 | 300,000 |
| Outside Michigan | 700,000 | 700,000 | 700,000 |
| Sales Percentage: |  |  |  |
| In Michigan | 90% | 90% | 90% |
| Outside Michigan | 10% | 10% | 10% |
| SBT Property Factor | 0.3 | 0.3333 | 0.2857 |
| SBT Payroll Factor | 0.3 | 0.3 | 0.3 |
| SBT Sales Factor | 0.9 | 0.9 | 0.9 |
| 3-Factor Apportionment | 0.5 | 0.5111 | 0.4952 |
| Apportioned Tax Base | $500,000 | $511,111 | $495,238 |
| Apportioned CAD: |  |  |  |
| Real Property | $0 | $100,000 | $0 |
| Personal Property | $0 | $0 | $0 |
| Adjusted Tax Base | $500,000 | $411,111 | $495,238 |
| Tax (at 2.35% rate) | $11,750 | $9,661 | $11,638 |
| Effective Tax Rate | 2.3500% | 1.8902% | 2.3500% |

Discriminatory advantage
of in-state investment:  0.4598% or $2,350

II.   A HYPOTHETICAL, PREDOMINANTLY MICHIGAN-BASED EXPORT COMPANY

A.   EFFECT OF PERSONAL PROPERTY INVESTMENTS

|  | At the outset | Following $100,000 personal property investment, | |
| --- | --- | --- | --- |
|  |  | in state | out of state |
| Total SBT Tax Base | $1,000,000 | $1,000,000 | $1,000,000 |
| Total Real Property | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 700,000 | 700,000 | 700,000 |
| Outside Michigan | 300,000 | 300,000 | 300,000 |
| Total Personal Property | $1,000,000 | $1,100,000 | $1,100,000 |
| In·Michigan | 700,000 | 800,000 | 700,000 |
| Outside Michigan | 300,000 | 300,000 | 400,000 |
| Total Payroll | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 700,000 | 700,000 | 700,000 |
| Outside Michigan | 300,000 | 300,000 | 300,000 |
| Sales Percentage: |  |  |  |
| In·Michigan | 10% | 10% | 10% |
| Outside Michigan | 90% | 90% | 90% |
| SBT Property Factor | 0.7 | 0.7143 | 0.6667 |
| SBT Payroll Factor | 0.7 | 0.7 | 0.7 |
| SBT Sales Factor | 0.1 | 0.1 | 0.1 |
| 3-Factor Apportionment | 0.5 | 0.5048 | 0.4889 |
| Apportioned Tax Base | $500,000 | $504,762 | $488,889 |
| Apportioned CAD: · |  |  |  |
| Real Property | $0 | $0 | $0 |
| Personal Property | $0 | $70,714 | $68,333 |
| Adjusted Tax Base | $500,000 | $434,048 | $420,556 |
| Tax (at 2.35% rate) | $11,750 | $10,200 | $9,883 |
| Effective Tax Rate | 2.3500% | 2.0208% | 2.0215% |

Discriminatory advantage
   of in-state investment:   0.0007% or $4

Discriminatory advantage of Michigan-based status,
   (1)   with regard to in-state investment:   0.1836% or $927
   (2)   with regard to out-of-state investment:   0.1896% or $927[33]

[33] These comparisons, as used in this table and the following table, compare the effective tax rates in columns two and three with the equivalent rates in the corresponding table (either I[A] or I[B], as appropriate). The dollar amounts represent the difference between the amounts of tax in columns two and three of the instant table and the amounts that would result if the corresponding effective tax rates from the corresponding table were applied to the relevant apportioned tax bases in the instant table.

B.   EFFECT OF REAL PROPERTY INVESTMENTS

|  | At the outset | Following $100,000 real property investment, | |
|---|---|---|---|
|  |  | in state | out of state |
| Total SBT Tax Base | $1,000,000 | $1,000,000 | $1,000,000 |
| Total Real Property | $1,000,000 | $1,100,000 | $1,100,000 |
| In Michigan | 700,000 | 800,000 | 700,000 |
| Outside Michigan | 300,000 | 300,000 | 400,000 |
| Total Personal Property | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 700,000 | 700,000 | 700,000 |
| Outside Michigan | 300,000 | 300,000 | 300,000 |
| Total Payroll | $1,000,000 | $1,000,000 | $1,000,000 |
| In Michigan | 700,000 | 700,000 | 700,000 |
| Outside Michigan | 300,000 | 300,000 | 300,000 |
| Sales Percentage: |  |  |  |
| In Michigan | 10% | 10% | 10% |
| Outside Michigan | 90% | 90% | 90% |
| SBT Property Factor | 0.7 | 0.7143 | 0.6667 |
| SBT Payroll Factor | 0.7 | 0.7 | 0.7 |
| SBT Sales Factor | 0.1 | 0.1 | 0.1 |
| 3-Factor Apportionment | 0.5 | 0.5048 | 0.4889 |
| Apportioned Tax Base | $500,000 | $504,762 | $488,889 |
| Apportioned CAD: |  |  |  |
| Real Property | $0 | $100,000 | $0 |
| Personal Property | $0 | $0 | $0 |
| Adjusted Tax Base | $500,000 | $404,762 · | $488,889 |
| Tax (at 2.35% rate) | $11,750 | $9,512 | $11,489 |
| Effective Tax Rate | 2.3500% | 1.8845% | 2.3500% |

Discriminatory advantage
   of in-state investment:   0.4655% or $2,350

Discriminatory advantage of Michigan-based
   status with regard to in-state investment:   0.0057% or $29[34]

[34] Both a Michigan-based and a non-Michigan-based company enjoy the same tax-rate advantage (which is to say, none) from investing in out-of-state real property. It might seem odd, thus, that a Michigan-based company would reap a greater benefit than a non-Michigan-based company from a given *in-state* real property investment, given that the real property CAD apportionment does not depend on Michigan-based status as reflected in the property and payroll factors, but rather depends exclusively on the location of the investment itself.

BRICKLEY, J. (*dissenting*). This case raises two relatively straightforward questions. The first is whether granting a deduction to companies on the basis of a percentage that changes depending upon the amount of a company's Michigan property and payroll relative to the total amount of its property and payroll is constitutional. The second, similarly, is whether providing an incentive in the form of a tax deduction for activity within Michigan, but declining to provide it for activity in other states, can withstand constitutional scrutiny. Because the United States Supreme Court has unequivocally declared that basing a deduction on the percentage of a company's in-state activity relative to its interstate activity is unconstitutional, I would answer the first question in the negative. However, because the United States Supreme Court has also consistently reaffirmed the propriety of uniformly available tax incentives, the latter question should be resolved in favor of constitutional validity.

I

Historically, the Commerce Clause has played an important role in guaranteeing the free flow of commerce among the states. Adopted in response to attempts by the legislatures of many states to

But as the effective tax rates in column two of this table and in table I(B) demonstrate, a slight discriminatory advantage in that regard does undeniably exist.

While I am not sure of the precise mechanism underlying this unexpected discriminatory effect, it clearly cannot "derive[ ] from . . . the general multistate apportionment formula." BRICKLEY, J., *post,* p 479, n 10. If the three-factor formula were applied uniformly to apportion both the tax base and the CAD, the effective tax rates following any given real property investment would be identical, regardless of the in- or out-of-state character of the company. Thus, contrary to Justice BRICKLEY's suggestion, this discriminatory effect neither "condemn[s] the three factor formula," nor can the validity of the three-factor formula be used to justify or explain away the effect. Cf. *id.*

exploit their natural advantages, the Commerce Clause created a national market for goods and services. *H P Hood & Sons, Inc v Du Mond,* 336 US 525; 69 S Ct 657; 93 L Ed 865 (1949). It did this by neutralizing the ability of states to extract wealth from other states. By linking the states together economically, the Commerce Clause fosters a strong political union.

The most blatant form in which states attempted to capture revenues from other states is the exaction of a duty. The Commerce Clause prohibits placing duties on the movement of goods in interstate commerce and few states engage in such crude discrimination. When they do, such statutes are struck down as a matter of course. *Chemical Waste Management, Inc v Hunt,* 504 US —; 112 S Ct 2009; 119 L Ed 2d 121 (1992); *Philadelphia v New Jersey,* 437 US 617; 98 S Ct 2531; 57 L Ed 2d 475 (1978). A more subtle version of the duty is a discriminatory tax. Instead of imposing the extra cost directly, the state relies on a company's ability to pass the tax on to its customers in other states. A company subject to a discriminatory tax thus becomes a conduit for extracting revenue from producers and consumers in other jurisdictions just as if an explicit duty had been placed on each transaction. *Trinova Corp v Dep't of Treasury,* 498 US 358, —; 111 S Ct 818; 112 L Ed 2d 884, 913 (1991) (the Commerce Clause defends against taxes that "attempt to capture tax revenues that . . . belong of right to other jurisdictions").

The Supreme Court has long recognized the danger discriminatory taxes pose to political union. *Welton v Missouri,* 91 US (23 Wall) 275; 23 L Ed 347 (1876); *Robbins v Shelby Co Taxing Dist,* 120 US 489; 7 S Ct 592; 30 L Ed 694 (1887). Whenever a state has attempted to use a tax to

extract revenue or coerce another's sovereign authority, the Court has invalidated the statute. *Kraft General Foods, Inc v Iowa Dep't of Revenue & Finance,* 505 US —; 112 S Ct 2365; 120 L Ed 2d 59 (1992); *New Energy Co of Indiana v Limbach,* 486 US 269; 108 S Ct 1803; 100 L Ed 2d 302 (1988); *Westinghouse Electric Corp v Tully,* 466 US 388; 104 S Ct 1856; 80 L Ed 2d 388 (1984); *Maryland v Louisiana,* 451 US 725; 101 S Ct 2114; 68 L Ed 2d 576 (1981); *Halliburton Oil Well Cementing Co v Reily,* 373 US 64; 83 S Ct 1201; 10 L Ed 2d 202 (1963); *McLeod v J E Dilworth Co,* 322 US 327; 64 S Ct 1023; 88 L Ed 1304 (1944). Conversely, when the Court has upheld state taxes, it has done so because the state was not using its leverage to divert revenue impermissibly from other states' citizens into its coffers. *Trinova Corp v Michigan Dep't of Treasury, supra; Dep't of Revenue v Ass'n of Washington Stevedoring Cos,* 435 US 734; 98 S Ct 1388; 55 L Ed 2d 682 (1978); *Standard Pressed Steel Co v Washington Dep't of Revenue,* 419 US 560; 95 S Ct 706; 42 L Ed 2d 719 (1975); *General Trading Co v Iowa Tax Comm,* 322 US 335; 64 S Ct 1028; 88 L Ed 1309 (1944); *Henneford v Silas Mason,* 300 US 577; 57 S Ct 524; 81 L Ed 814 (1936); *Western Union Telegraph Co v Attorney General of Massachusetts,* 125 US 530; 8 S Ct 961; 31 L Ed 790 (1888). Multiplying examples serves no useful purpose except to reinforce both the logical and historical linkage of the use of leverage and invalidity under the Commerce Clause.

Only in light of this background can the phrases "discrimination," "economic protectionism," and "burden interstate commerce" have any meaning.[1]

---

[1] As Justice Cardozo eloquently warned, "Catch words and labels, such as the words 'protective tariff,' are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off our guard." *Henneford, supra* at 586.

Each phrase refers to the use of a state's political power over activity within its jurisdiction to exert power over activity beyond its borders. Whether in the form of isolation of in-state markets from the broader national economy, *Wyoming v Oklahoma,* 502 US —; 112 S Ct 789; 117 L Ed 2d 1 (1992), or participation in in-state markets under unequal conditions, *Westinghouse Electric Corp v Tully, supra,* the Commerce Clause nullifies any extraterritorial exertion of power over commerce.

Several propositions of law follow directly from the Commerce Clause's protection of interstate enterprise. No state may tax "a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco, Inc v Hardesty,* 467 US 638, 642; 104 S Ct 2620; 81 L Ed 2d 540 (1984); see also *Boston Stock Exchange v State Tax Comm,* 429 US 318; 97 S Ct 599; 50 L Ed 2d 514 (1977). Because it is likely to represent protectionism, *American Trucking Ass'ns, Inc v Scheiner,* 483 US 266; 107 S Ct 2829; 97 L Ed 2d 226 (1987) (Scalia, J., dissenting), any cost imposed selectively on interstate commerce runs afoul of the Commerce Clause. From license fees borne in greater amounts by interstate salesmen, *Welton v Missouri, supra; Robbins v Shelby Co Taxing Dist, supra,* to lump-sum taxes falling more heavily on interstate trucking, *American Trucking Ass'ns v Scheiner, supra; United States v Sperry Corp,* 493 US 52, 61, n 7; 110 S Ct 387; 107 L Ed 2d 290 (1989), to tax codes that, through an interlocking system of credits and deductions, unequally burden interstate commerce, *Halliburton Oil Well Cementing Co v Reily, supra; Boston Stock Exchange v State Tax Comm, supra; Maryland v Louisiana, supra; Westinghouse Electric Corp v Tully, supra,* no tax treating interstate commerce unequally and disadvantageously has

survived scrutiny under the Commerce Clause.[2] The rule is simple and absolute: Interstate commerce is not, and may not be made, a means for the export of tax burdens or the import of tax revenues. *Trinova Corp, supra.*

The beguiling simplicity of these rules makes straying from their purpose and rationale easy. Because discrimination involves the use of power in a way hostile to political and economic union, once a tax is found to discriminate, the amount of discrimination is irrelevant. Other states' tax laws cannot validate discrimination, *Armco Inc v Hardesty, supra* at 644-645; *Freeman v Hewit,* 329 US 249; 67 S Ct 274; 91 L Ed 265 (1946),[3] because these laws in no way repair the damage to union caused by the initially improper exercise of power. Furthermore, if a credit discriminates, it is irrelevant whether a tax or formula fairly reflects the in-state component of business activity. *Westinghouse Electric Corp, supra.* Such an inquiry

---

[2] As a leading scholar aptly remarked:

> Aside from Justice Scalia . . . no sitting Supreme Court Justice would dissent from the view that the commerce clause prohibits taxes that bear more heavily on the interstate than the intrastate enterprise merely because the former does business across state lines. [Hellerstein, *Is "internal consistency" foolish?: Reflections on an emerging Commerce Clause restraint on state taxation,* 87 Mich L R 138, 164 (1988).]

[3] The majority indicates that business behavior should never be analyzed in what it describes as a "theoretical vacuum." *Ante* at 410, n 14. The United States Supreme Court has never relied on empirical evidence to nullify a tax law. In *Westinghouse Electric Corp v Tully, supra,* the Supreme Court struck down New York's tax on income from domestic international sales corporations (DISC) on the basis of abstract algebraic analysis, not on any empirical evidence relating to the tax. *Id.* at 400, n 9. In fact, the Court ignored empirical evidence provided by amicus curiae State of California suggesting that New York's tax did not encourage increased shipping from New York. The Supreme Court has rejected other attempts to provide empirical evidence. *Maryland v Louisiana, supra* at 760. See also *Boston Stock Exchange v State Tax Comm, supra* at 331; *Armco v Hardesty, supra* at 645, n 8.

"serves only to obscure," *id.* at 398, and make
more difficult the determination whether a partic-
ular statute threatens the values protected by the
Commerce Clause.

The specific question before us involves two
deductions provided by the single business tax.
One deduction, the capital acquisition deduction
for personal property, is offered to companies and
is dependent on the amount of property and pay-
roll in Michigan relative to the amount elsewhere.
The other, the CAD for real property, is offered to
all companies regardless of the interstate or intra-
state character of their property when they pur-
chase depreciable real property in Michigan. The
first deduction is provided on an impermissible
basis, and a precisely analogous deduction has
been condemned by the Supreme Court. In light of
*Westinghouse Electric Corp v Tully, supra,* I would
hold the CAD for personal property unconstitu-
tional. The second deduction, however, is provided
wholly independent of a company's interstate
character. Because this deduction does not, and
cannot be made to, tax extraterritorial value, I
would hold that the CAD for real property does not
violate the Commerce Clause.

II

A multistate company may deduct a portion of
its capital acquisition costs from its apportioned
tax base. To arrive at the apportioned tax base, a
company uses an apportionment formula provided
by statute. This formula is the average of the
company's sales factor, property factor, and pay-
roll factor. MCL 208.45; MSA 7.558(45).[4] This ad-

---

[4] The sales factor is the percentage of a company's sales made in
Michigan. MCL 208.51; MSA 7.558(51). Analogously, the property and
payroll factors are the percentages of property and payroll in Michi-

justment allocates a share of a company's gross tax base to Michigan, as required by the Due Process and Commerce Clauses. *Quill Corp v North Dakota,* 504 US —; 112 S Ct 1904; 119 L Ed 2d 91 (1992); *Moorman Mfg Co v Bair,* 437 US 267; 98 S Ct 2340; 57 L Ed 2d 197 (1978); *Complete Auto Transit, Inc v Brady,* 430 US 274; 97 S Ct 1076; 51 L Ed 2d 326 (1977).

After calculating its apportioned tax base, a company deducts the cost of its capital acquisitions. The single business tax treats acquisitions of depreciable real property[5] and personal property differently. A company may deduct the entire cost of real property located in Michigan but may deduct none of the cost of real property located elsewhere. MCL 208.23(c); MSA 7.558(23)(c). The portion of the cost of personal property a company may deduct depends upon the value of another apportionment formula. Unlike the three-factor formula, this formula is merely the average of a company's property and payroll factors. MCL 208.23(a); MSA 7.558(23)(a).

Caterpillar contends that this statutory arrangement is unconstitutional. The CAD offered for depreciable personal property is assailed on two grounds. First, it is suggested that a company having a larger initial investment in Michigan receives a greater deduction than a company having a lesser investment. Second, Caterpillar argues that the CAD for personal property is a form of percentage-based deduction specifically condemned

gan respectively. MCL 208.46; MSA 7.558(46), MCL 208.49; MSA 7.558(49).

[5] Technically, which formula a company uses to determine its deduction depends upon the classification of that property for federal income tax purposes. Property falling under 26 USC 1250 qualifies for a deduction pursuant to MCL 208.23(c); MSA 7.558(23)(c), i.e, the CAD for depreciable real property. Depreciable property not falling under § 1250 qualifies for a deduction pursuant to MCL 208.23(a); MSA 7.558(23)(a), i.e., the CAD for tangible personal property.

in *Westinghouse Electric Corp v Tully, supra.* The CAD for real property is challenged on separate grounds. Caterpillar contends that encouraging companies to locate productive resources in Michigan violates the Commerce Clause. The first contention is correct; the CAD for personal property is an impermissible percentage-based deduction. The CAD for real property, however, is available to all companies regardless of their interstate activity and does not discriminate in violation of the Commerce Clause.

### A. THE CAD FOR PERSONAL PROPERTY

In *Westinghouse Electric Corp v Tully, supra,* the Supreme Court considered a credit New York offered for using New York facilities for exporting goods to other countries: the greater the New York-based exports, compared to a company's total exports, the greater the credit the company was offered. The Supreme Court unanimously invalidated the credit.

The Court found that the credit not only " 'provide[d] a positive incentive for increased business activity in New York State,' but also it penalize[d] increases in . . . shipping activities in other States." *Id.* at 401 (internal quotation and citation omitted). The penalty, the Court found, arose because New York decreased the incentive it awarded for in-state activity as out-of-state activity increased. This effect occurred because increases in out-of-state activity lowered the relative percentage of New York-based exports to the company's total exports. *Id.* at 400, n 9. Summing up its analysis of the credit, the Court wrote: "[T]he credit is awarded in a discriminatory manner on the basis of the percentage of a [company's] shipping conducted from within the State of New

York." *Id.* at 402, n 9. Because a company's tax would increase if it took advantage of an incentive offered by another state, New York impaired the free flow of interstate commerce and clogged competition among the states for the export trade.

In deciding the case, the Court noted that the opinion might cast doubt on investment credits generally. Because all investment credits reward in-state activity while denying a reward to out-of-state activity, it might be suggested that discrimination necessarily results. Denying the validity of this interpretation, the Court wrote: "We reiterate that it is not the provision of the credit that offends the Commerce Clause, but the fact that it is allowed on an impermissible basis, i.e., the percentage of a specific segment of the corporation's business that is conducted in New York." *Id.* at 406, n 12. The rule emerging from *Westinghouse Electric Corp* is clear-cut: Basing a deduction on a change in a subset of a company's in-state activity relative to its total activity is unconstitutional.[6]

Applying this rule to the CAD for personal property leads to the conclusion that it is invalid. The amount of the deduction is determined by multiplying the cost of the asset by a percentage defined as the average percentage of property and payroll a company has in Michigan. This percentage, reflects only a portion of a company's economic

---

[6] It is important to emphasize that one looks to the entire tax statute to define the range of economic activity relevant to a particular tax. Regarding the SBT, that range is defined in terms of a sales factor, a property factor, and a payroll factor. The CAD for personal property is based only on the payroll factor and the property factor. By focusing on only two-thirds of a company's jurisdictionally relevant activity, the combination of the multistate apportionment formula and the CAD for personal property necessarily has the effect condemned in *Westinghouse Electric Corp, supra.* Thus, a deduction apportioned with the same formula as multistate activity generally would reflect the change in the entire activity in Michigan. The result would likely be constitutional.

activity in Michigan. As such, the formula falls for the same reason as the credit in · *Westinghouse Electric Corp:* it lowers a company's incentive as it acquires and locates more property or payroll outside of Michigan.

A simple numerical example should illustrate this effect. Suppose a company purchases a new asset in another state costing $100,000. It has 50 percent of its property and payroll in Michigan before the purchase. By placing the asset in another state,· the percentage of its Michigan property and payroll will necessarily decrease. If the percentage decreases to 45 percent, the company only receives a $45,000 deduction, suffering a penalty of $5,000. If, however, the company places the new asset in Michigan, the percentage of Michigan property will increase. Instead of suffering a $5,000 penalty, the company will receive a $5,000 bonus. If the company continues to purchase new assets and to place them out of state, the amount of its deduction for each new purchase decreases because its percentage of Michigan property and payroll decreases. Worse, the CAD for personal property can punish economic efficiency and growth. If the relative amount of property and payroll in Michigan decreases because a company grows, the effect is the same as when the company purchased a new asset: a lesser deduction for activity qualifying for one because it grew in other states and not in Michigan.[7] Just as it was in *Westinghouse Electric Corp,* this method of granting a credit is unconstitutional.

The Attorney General and amici curiae defend the CAD for personal property with four argu-

[7] The absolute decrease alone is insufficient to require a finding of unconstitutionality. The problem is that the CAD for personal property decreases faster than the apportioned tax base. For every 10 percent decrease in the CAD for personal property, the apportioned tax base decreases by 6.6 percent.

ments. None, however, show how the CAD can escape the rule of *Westinghouse Electric Corp.* First, the Attorney General argues that the Commerce Clause does not require the state to use symmetrical formulas to apportion the tax base and the CAD for personal property. While not requiring symmetry, the Commerce Clause does require that the statute not be discriminatory. *Westinghouse Electric Corp v Tully, supra,* clearly holds that formulas that lower the amount of a deduction because the percentage of a company's property and payroll in state decreases relative to its total property and payroll are discriminatory. The CAD for personal property is such a formula. It is, therefore, unconstitutional. The Attorney General's argument does not even address this syllogism.

Secondly, the Attorney General suggests that the CAD for personal property is available to all taxpayers. This observation is as irrelevant as it is correct. All taxpayers can qualify for a CAD for personal property. The amount of the CAD, however, is determined by the percentage of a company's property and payroll in Michigan, relative to its total property and payroll. But, as *Westinghouse Electric Corp* makes clear, the federal constitution does not permit the deduction to be offered on that basis. This characteristic means that the CAD is available on different, less favorable terms to companies depending on the amount of their interstate activities. The constitution does not permit such distinctions.

The Attorney General's final two contentions are more substantial. The first suggestion is that providing a credit on the basis of the percentage of in-state property relative to a company's total property and payroll benefits all companies that increase their in-state business. But "[t]he fact

that this discrimination is in favor of nonresident, in-state sales which may also be considered as interstate commerce, does not save [the statute] from the restrictions of the Commerce Clause." *Boston Stock Exchange v State Tax Comm, supra* at 334 (citation omitted). One of those restrictions is a prohibition of percentage-based deductions. A deduction granted on this basis necessarily penalizes increases in out-of-state activity. Absent such a penalty, a credit is constitutional, but the CAD for personal property inevitably decreases the incentive offered for Michigan activity as interstate activity increases. This the state may not do.

The Attorney General's last argument attempts to make a virtue out of necessity. It is suggested that limiting the deduction according to the relative percentage of a company's in-state property "closely approximates" that company's business activity generally. Michigan does have a strong and legitimate interest in not being "overly generous" with the CAD for personal property. *Westinghouse Electric Corp, supra* at 399. That interest, however, does not justify using a segment of the company's activity to apportion the deduction. By using a formula based only on a company's property and payroll in Michigan as compared to property and payroll elsewhere, the SBT guarantees that companies moving assets out of state suffer a discriminatory penalty. This penalty renders the CAD for personal property, MCL 208.23(a); MSA 7.558(23)(a), unconstitutional.

### B. THE CAD FOR DEPRECIABLE REAL PROPERTY

The CAD for real property offers a deduction of the cost of depreciable real property located in Michigan in the year of acquisition. The purchase of depreciable real property in other states does

not qualify for the deduction. MCL 208.23(c); MSA
7.558(23)(c). Caterpillar attacks the CAD because it
encourages companies to locate assets in Michigan
by lowering the effective cost on intrastate trans-
actions. The Supreme Court has, however, un-
equivocally indicated that encouraging intrastate
investment does not violate the Commerce Clause
when nondiscriminatory means are used. Because
the CAD for real property treats all acquisitions of
real property in Michigan without regard to a
company's interstate activity, I would find the CAD
constitutional.

The constitutionality of the CAD for real prop-
erty depends on whether it facially discriminates
against interstate commerce. Facial discrimination
results when a statute creates two categories of
jurisdictional activity, one that is composed of
intrastate activity and one that is composed of
interstate activity, and imposes a burden on the
interstate activity not shared by intrastate taxpay-
ers. See e.g., *Kraft General Foods, Inc v Iowa Dep't
of Revenue & Finance; Maryland v Louisiana;
Boston Stock Exchange v State Tax Comm, supra.*[8]
The inquiry is essentially the same when a statute
providing a credit is challenged. *Westinghouse
Electric Corp v Tully, supra.* The question is
whether two companies engaging in the qualifying

[8] Chief Justice CAVANAGH reads *Boston Stock Exchange, supra,* as
being inconsistent with this statement. CAVANAGH, C.J., *ante* at 458.
This overlooks how the New York Transfer Tax worked. Most securi-
ties are transferred in New York. New York places a small tax on
each transfer. Before a transfer happens, a sale or trade occurs. New
York divided New York transfers into two groups: a non-New York
sale or a New York sale. It penalized the non-New York sales with
unfavorable tax rates and terms. The essential pattern is present
here: division of jurisdictional activity into two groups and unfavora-
ble treatment for the group containing non-New York activity. The
Supreme Court specifically rejected the contention that because some
investors might sell in New York instead of in other states, thereby
increasing interstate commercial activity, such clear discrimination
was justified. Thus, *Boston Stock Exchange, supra,* supports the text,
instead of contradicting it.

activity receive the same credit regardless of their interstate activity. If they do, the statute does not discriminate. If, however, an interstate enterprise receives a lesser credit because it operates in interstate commerce, the credit is unconstitutional. Once the statute is found not to discriminate facially, the inquiry shifts to whether it, in effect, taxes extraterritorial value. *Trinova Corp v Michigan Dep't of Treasury, supra.* To resolve this question, one looks to whether the tax is fairly apportioned.[9] *Trinova Corp, supra; Container Corp of America v Franchise Tax Bd,* 463 US 159; 103 S Ct 2933; 77 L Ed 2d 545 (1983). If it is fairly apportioned, the tax cannot tax extraterritorial value because no extraterritorial value is available for taxation. The tax would therefore be constitutional.

The CAD for real property does not discriminate against interstate commerce. If a company acquires new depreciable real property in Michigan, it receives a CAD equal to the cost of that asset. This is true whether the company is overwhelmingly multistate or overwhelmingly intrastate.[10] The company's status as an interstate or intrastate

[9] This reading of the relevant cases does not create an inconsistency between *Trinova Corp v Michigan Dep't of Treasury, supra,* and *Amerada Hess Corp v New Jersey Dep't of Treasury,* 490 US 66; 109 S Ct 1617; 104 L Ed 2d 58 (1989), and *Westinghouse Electric Corp v Tully, supra.* The latter two cases merely reinforce the principle that facial discrimination is prohibited, even if extraterritorial value has not been taxed directly. The former establishes that absent facial discrimination, analysis must focus on the danger of extraterritorial taxation.

[10] Chief Justice CAVANAGH points out what he describes as a primary "discriminatory effect" deriving from whether a company is predominantly Michigan-based or predominantly multistate. For the CAD for personal property, this effect reflects the percentage basis upon which the deduction is offered. With respect to the CAD for real property, this effect, as he indicates, derives from the proportionate change in the general multistate apportionment formula. *Ante,* Appendix II(B), p 465, n 34. In light of the numerous decisions of the United States Supreme Court upholding the three-factor formula, *Trinova Corp, supra,* this effect cannot be labeled discriminatory.

enterprise is wholly irrelevant to the operation of the tax. Although Caterpillar does not dispute the uniform application of the credit, Chief Justice CAVANAGH in dissent does. He observes that when a company acquires an asset in Michigan it receives a deduction and that when a company acquires an asset in another state it does not. From this, he concludes that the CAD facially discriminates.[11]

I do not share this view for two reasons. First, it is entirely permissible to grant a credit using in-state activity as a criterion. As the Chief Justice discusses in detail, the Supreme Court has never said that providing incentives for the growth of intrastate industry violates the Commerce Clause. In fact, the consistent theme of the Court's decisions has been that such incentives promote free trade among the states. As the Supreme Court noted in *Trinova Corp v Michigan Dep't of Treasury, supra,* 112 L Ed 2d 912, "It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing state. States are free to 'structur[e] their tax systems to encourage the growth and development of intrastate commerce and industry,'" quoting *Boston Stock Exchange v State Tax Comm.* Far from threatening interstate commerce, investment incentives enhance the competition that "lies at the heart of a free trade policy." *Boston Stock Exchange v State Tax Comm, supra* at 337; *Metropolitan Life Ins Co v*

However, even if it could, the presence of the effect would condemn the three-factor formula, not the CAD for real property.

[11] I note that the Chief Justice's discussion is framed in terms of net effective tax rates. Ultimately, however, the difference in net effective tax rates derives from the fact that one company qualified for the deduction while another did not. If the Commerce Clause allows a state to use in-state location as a criterion for deductibility, the difference would clearly be justified.

*Ward,* 470 US 869; 105 S Ct 1676; 84 L Ed 2d 751 (1985). Encouraging intrastate industry is not an impermissible purpose.[12]

Additionally, the Court has emphasized that providing credits to encourage particular kinds of in-state activity is constitutional. As the Court paused to note in *Westinghouse Electric Corp v Tully,* 466 US 406, n 12, the only recent case to consider a tax credit specifically, "We reiterate that it is not the provision of the credit that offends the Commerce Clause, but the fact that it is allowed on an impermissible basis, i.e., the percentage of a specific segment of the corporation's business that is conducted in New York." If the Chief Justice's analysis is correct, this statement is incorrect because any credit necessarily creates a difference between those who qualify for it and those who do not qualify for it. This kind of difference is not constitutionally significant.

More importantly, Chief Justice CAVANAGH's analysis hinges on a faulty comparison of in-state, jurisdictional activity and out-of-state, nonjurisdictional activity. For the purposes of the Commerce Clause, these activities are noncomparable. The essential prohibition of the Commerce Clause is that a state may not treat jurisdictional activity differently simply because one company operates

---

[12] Chief Justice CAVANAGH suggests that showing a permissible purpose does not necessarily demonstrate constitutional validity. This is true when the means are unconstitutional. However, the United States·Supreme Court has indicated that providing a credit based on in-state activity, as long as it does not penalize interstate commerce, is constitutional. *Westinghouse Electric Corp, supra* at 400-401 ("[N]ot only does the New York tax scheme 'provide a positive incentive for increased business activity in New York State,' but also it *penalizes increases in the DISC's shipping activities in other States*"). (Citation omitted.) Because the CAD for real property does not penalize increases in activity in other states, it is a legitimate, nondiscriminatory tax incentive. In light of this, the only question is whether the purpose behind the CAD for real property is legitimate. Given the cases described above, the answer is clearly yes.

in interstate commerce and another does not. Two
cases illustrating this proposition are *Maryland v
Louisiana* and *Kraft General Foods, Inc v Iowa
Dep't of Revenue & Finance.*

In *Maryland v Louisiana,* the Supreme Court
considered a challenge to a Louisiana tax, known
as the First-Use Tax. The tax was imposed on all
natural gas refined in Louisiana. Additionally, the
tax provided credits for numerous uses of natural
gas consumed in Louisiana. Louisiana had thus
effectively distinguished between two types of nat-
ural gas: interstate natural gas (which, by defini-
tion, cannot be consumed in Louisiana) and domes-
tic natural gas. The Court struck this statute down
unanimously because Louisiana had taxed two
types of jurisdictional activity differently and re-
served the higher rates for interstate commerce.
The Court compared treatment of jurisdictional
activity; it did not compare treatment of natural
gas refined in Texas and shipped interstate with
the credits Louisiana offered, as the Chief Justice's
analysis suggests would have been appropriate.

The most recent case illustrating this analysis is
*Kraft General Foods.* In that case, the Supreme
Court considered whether Iowa's taxation of divi-
dends paid by a foreign corporation to an Iowa
parent corporation but exemption of dividends
paid by a domestic corporation to an Iowa parent
corporation was constitutional. The Court invali-
dated the tax using the same analysis it had in
*Maryland v Louisiana.* Iowa had divided the activi-
ties within its jurisdiction into two categories and
treated the category containing foreign dividends
less favorably than the category containing domes-
tic dividends. When analyzing whether a tax is
discriminatory, then, the proper inquiry is
whether the state treats types of activity within its
jurisdiction differently because of "some interstate

element." *Armco, Inc v Hardesty, supra.* If so and the interstate group bears a burden from which the intrastate group is exempted, the tax is unconstitutional. The CAD for real property simply does not discriminate facially.

The final question is whether the CAD for real property has discriminatory effects. This analysis focuses on whether the tax is a means to "export tax burdens or import tax revenues." *Trinova Corp v Michigan Dep't of Treasury,* 112 L Ed 2d 912. As the Supreme Court has noted, however, a tax does not have a discriminatory effect if it is fairly apportioned. *Trinova Corp, supra.* This conclusion follows directly from the concept of fair apportionment. If a tax is fairly apportioned, it distinguishes accurately between value-added properly attributable to Michigan and value-added properly attributable to other states. *Container Corp of America v Franchise Tax Bd, supra.* In other words, the burden of the tax is imposed only on value-added attributable to Michigan.[13] As such, extraterritorial value is not taxed, and Michigan does not export burdens or unfairly import revenues. Because the SBT generally is fairly apportioned, the CAD for real property does not import revenue or export burdens to other states. Absent either facial

---

[13] The other dissent suggests that the company will be taxed to a certain extent on the value-added derived from out-of-state operations. *Ante* at 453-454. The three-factor formula, however, allocates value-added to other jurisdictions so that extraterritorial values are not taxed. As such, the statement that Michigan taxes "a non-Michigan-based company's productive activities conducted at out-of-state factories with out-of-state employees and equipment," *id.* at 454, and then fails to provide a deduction for those activities would appear incorrect. Michigan does not tax any of those activities. To the extent that a company believes it is subjected to such taxation in spite of the change in the three-factor formula, the single business tax offers the company an opportunity to apportion its activities to reflect more accurately its jurisdictional activity. MCL 208.69; MSA 7.558(69); *Trinova Corp v Dep't of Treasury,* 433 Mich 141; 445 NW2d 428 (1989).

discrimination or a discriminatory effect, I would find the CAD for real property to be constitutional.

The federal constitution prohibits Michigan from penalizing interstate commercial activity. The CAD for personal property is awarded on an impermissible percentage basis. As such, it provides an incentive for investing in Michigan and punishment for investing elsewhere. The CAD for real property is different. Any company purchasing depreciable real property in Michigan receives the deduction for the asset's full cost no matter whether the company operates in several states or operates only in Michigan. I conclude, then, that the CAD for real property is constitutional while the CAD for personal property is not. In view of the majority's resolution of this issue, I will not speculate at this juncture about what an appropriate remedy might be.